# United States Court of Appeals
## For the First Circuit

No. 98-2349

UNITED STATES OF AMERICA,

Appellee,

v.

JOHN ALEXIS MOJICA-BAEZ,

Defendant, Appellant.

No. 98-2350

UNITED STATES OF AMERICA,

Appellee,

v.

JOSUE G. REYES-HERNANDEZ,

Defendant, Appellant.

No. 98-2351

UNITED STATES OF AMERICA,

Appellee,

v.

RODOLFO E. LANDA-RIVERA,

Defendant, Appellant.

No. 98-2352

UNITED STATES OF AMERICA,

Appellee,

v.

NELSON CARTAGENA-MERCED,

Defendant, Appellant.

————————————

No. 98-2353

UNITED STATES OF AMERICA,

Appellee,

v.

JOSE RAMOS-CARTAGENA,

Defendant, Appellant.

————————————

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, U.S. District Judge]

————————————

Before

Stahl and Lynch, Circuit Judges,
and Gorton, District Judge.[*]

————————————

[*]    Of the District of Massachusetts, sitting by designation.

-3-

_____

Robin J. Adler for appellant Mojica-Baez.

David W. Roman, with whom Brown & Ubarri was on brief, for appellant Reyes-Hernandez.

Rafael F. Castro Lang for appellant Landa-Rivera.

Roberto Roldan-Burgos, by appointment of the court, for appellant Cartagena-Merced.

Miriam Ramos Grateroles for appellant Ramos-Cartagena.

Timothy L. Faerber and Nelson Pérez-Sosa, Assistant United States Attorneys, with whom Guillermo Gil, United States Attorney, and Jorge E. Vega-Pacheco, Assistant United States Attorney, were on brief, for appellee.

_____

August 30, 2000

_____

**LYNCH, Circuit Judge**.   Three armed men dressed in security guard uniforms held up the Loomis, Fargo & Co. armored car depot in Ponce, Puerto Rico, on May 13, 1997, while a fourth robber stood watch outside.  The robbers took the Loomis Fargo guards captive as they returned to the company's offices in armored vehicles from runs to area banks.  All told, the robbers got away with an estimated $5.5 million.  Only about half a million dollars was recovered; the weapons used were never recovered.  Four of the five defendants involved in this appeal were convicted of the robbery and received sentences ranging from 308 months to 355 months; the fifth defendant was convicted of helping in the aftermath and was sentenced to 150 months imprisonment.

The defendants originally raised a myriad of arguments on appeal.  In addition, after the Supreme Court decided United States v. Castillo, 120 S. Ct. 2090 (2000), we requested that the parties brief the effect of that decision.  None of the

defendants had raised at trial or on appeal a <u>Castillo</u> claim that the use of a semiautomatic assault weapon in the robbery was an element -- and not merely a sentencing factor -- of a firearms offense. <u>See</u> 18 U.S.C. § 924(c)(1)(A), (B). This is our first occasion to discuss the effects of <u>Castillo</u> on trials and indictments, and our view on the indictment issue is quite different from the view of another circuit. Save for one sentencing issue regarding one defendant -- as to which the government agrees that there was error and that the matter should be remanded -- we reject the defendants' arguments.

# I.

The four main defendants are John Alexis Mojica-Baez, Josue G. Reyes-Hernandez, Nelson Cartagena-Merced, and Jose Ramos-Cartagena. After a trial lasting almost a month, they were convicted of committing the robbery. Specifically, all four of these defendants were convicted of two counts of armed robbery, in violation of 18 U.S.C. §§ 2, 2113(a), (d); one count of assault, in violation of 18 U.S.C. §§ 2, 2114(a); one count of breaking and entering, in violation of 18 U.S.C. §§ 2, 2117; and one count of using and carrying a firearm in relation to a crime of violence, in violation of 18 U.S.C. §§ 2, 924(c)(1). Another co-defendant, Rodolfo E. Landa-Rivera, was convicted of being an accessory after the fact to the robbery, in violation of 18 U.S.C. §§ 3, 2113(a).[1]

The jury reasonably could have found the following facts. Loomis Fargo[2] armored trucks and vans began arriving at the Loomis Fargo depot in Ponce shortly after 7 p.m. on May 13, 1997. The vehicles were returning with cash from the day's

---

[1]     We address the appeal of another co-defendant, Jessica Vega-Coreano, in United States v. Vega-Coreano, No. 99-1343, in an opinion published simultaneously with this one.

[2]     At the time, the company was named Wells Fargo.

-6-

routes, which included a stop at a United States Post Office and two federally insured banks, Banco Popular and Banco Santander. When one of the guards from the first vehicle to arrive entered the depot office, he was met by three men carrying long firearms. They told him it was a hold up and that he was not to move or they would shoot him. The three were dressed in uniforms similar to Loomis Fargo uniforms and were wearing bulletproof vests. As four successive trucks arrived at the depot, the three men disarmed the guards, handcuffed them, and locked them in a bathroom. The contents of the Loomis Fargo vehicles were systematically transferred to a Loomis Fargo van commandeered by the robbers. A fourth person, outside, worked in tandem with the three fake guards, communicating with them by walkie-talkie.

The robbers were voluble, threatening the guards, telling them, "Last week we had to kill one guy, so you guys better do what we say." They also told the guards several times how powerful their weapons were, claiming, "This AK-47 that I have here can actually punch through 12 guys," and "This thing can even go through cement." One of the guards recognized a weapon as an AK-47 and heard one of the robbers say, "This is an

AK-47, and if I shoot you with this, I'll rip you up. I'll just rip a part of you off." Another guard described the firearms carried by the robbers as "assault weapons, big weapons."

The robbers also commented on their professionalism. One of the guards testified that the robbers kept saying, "Look how professional we are. We're really professionals." The robbers reiterated that they were professionals, unlike the other robbers who had been quickly caught after a recent, unrelated Brinks robbery.

Once the Loomis Fargo van was loaded, the guard the robbers had forced to help them was trussed and pushed into the small bathroom that held nine other guards. The guards were then locked in and they heard the robbers threaten to set the place on fire. It took the guards about forty minutes to free themselves; they then called for help. The handcuffs had to be cut off of the guards, as the key holes had been soldered (or welded) closed.

The robbers drove the Loomis Fargo van to another location and transferred the money to a different vehicle, but they left thirty unopened bags of money in the Loomis Fargo van.

Evidence tied the defendants to the robbery almost

immediately afterwards. When news of the robbery was broadcast on television, Ramos-Cartagena's wife, Jessica Vega-Coreano, told Jessica Diaz-Nevarro, a friend and upstairs neighbor, that Ramos-Cartagena and Reyes-Hernandez had committed the robbery. The evening of the robbery, Ramos-Cartagena and Reyes-Hernandez arrived back at Ramos-Cartagena's house driving a heavily laden van. Reyes-Hernandez was wearing a uniform similar to a Loomis Fargo uniform. Ramos-Cartagena ran into the house and asked Vega-Coreano for keys. He had a cut on his head and was shirtless. Vega-Coreano gave him a shirt to put on and asked why they had not gotten rid of the clothes, to which he responded, "Forget the shirt, I need the keys, I want the keys, because we have to leave." He found the keys and drove off. A short time later, Cartagena-Merced and Mojica-Baez arrived. Mojica-Baez appeared happy, and he embraced Vega-Coreano and said, "We did it. We did it" or "We won, we won." Cartagena-Merced also appeared to be happy.

The robbery was, of course, planned in advance. According to Diaz-Nevarro, the defendants met almost daily during the two weeks prior the robbery. Diaz-Nevarro also saw Ramos-Cartagena, Mojica-Baez, and Reyes-Hernandez loading

ammunition into two long and three short guns the day before the robbery. Landa-Rivera, who ultimately took some of the money to hide, was also seen around the house before the robbery.

A confidential informant reported to the FBI that before the robbery the defendants had stolen a van in the San Juan area. After the robbery, a white van containing veterinary products was found in a parking lot near the Loomis Fargo depot. The van had been stolen from a veterinary products distributor about a week before the robbery. Diaz-Nevarro testified to seeing similar veterinary products in Ramos-Cartagena's house, and, after having obtained warrants to search the defendants' homes (based upon information provided by the confidential informant), FBI agents found such products when they searched the house.

The searches of the defendants' homes produced a wealth of other incriminating evidence, including: $387,000 in cash buried near Mojica-Baez's uncle's house and $13,000 in cash inside the house;[3] AK-47 ammunition and part of the barrel of an AR-15 assault rifle at Mojica-Baez's house; $2,500 in cash in a

---

[3] Mojica-Baez's uncle told police that someone had given him the $13,000 to hold and had told him that it was from the Loomis Fargo robbery.

McDonald's bag hidden in a mattress and over $1,000 in a box and in a magazine at Cartagena-Merced's house; a photograph of Ramos-Cartagena holding an AK-47, AK-47 ammunition, police uniforms similar to Loomis Fargo uniforms, two ski masks, four boxes of two-way radios, some welding equipment, and wrappers from Banco Popular and Banco Santander at Ramos-Cartagena's house; wrappers from Banco Santander, a bag containing almost $8,000 in cash, and a $45,000 check from the Lottery of Puerto Rico made out to Reyes-Hernandez's mother and issued a week after the robbery[4] at Reyes-Hernandez's house; and a total of $8,800 in cash in Landa-Rivera's car.

After their homes were searched, Ramos-Cartagena, Reyes-Hernandez, Mojica-Baez, and Vega-Coreano traveled together to the Geminis Hotel and rented rooms there. From there they moved to the Joyuda Beach Parador Hotel, registering for three rooms under a false name.

Unable to contain themselves with the riches, some of the defendants went on spending sprees. The day after the

---

[4]    The record does not reveal the government's theory with regard to the lottery check. It would seem that the government believed the check was evidence of money laundering, see, e.g., United States v. Gonzalez-Maldonado, 115 F.3d 9, 19 (1st Cir. 1997), but there is no evidence in the record to that effect.

-11-

robbery, Reyes-Hernandez bought a jet ski for $9,300 in cash (carried in a plastic grocery bag). A search of the car in which Ramos-Cartagena, Reyes-Hernandez, Mojica-Baez, and Vega-Coreano were traveling when they were arrested turned up a jewelry store receipt for a $900 cash purchase of two watches. Cash abounded.

Unable to contain themselves verbally, the different defendants made incriminating statements to others. Two days after the robbery, Diaz-Nevarro overheard Reyes-Hernandez, in the presence of Ramos-Cartagena, detailing what happened at the Loomis Fargo office to Vega-Coreano. Diaz-Nevarro also overheard Landa-Rivera describing to Vega-Coreano how the guards had been tied up as they arrived at the depot. Diaz-Nevarro testified that Ramos-Cartagena and Reyes-Hernandez were laughing in response. Once arrested, Reyes-Hernandez, Ramos-Cartagena, and Landa-Rivera told a fellow jailmate, Luis Nevarez-Marrero, details of the planning and execution of the crime and their efforts to get away. When arrested, Landa-Rivera told police that he had been paid $6,000 to watch over two suitcases containing $200,000 each from the Loomis Fargo robbery.

After he was arrested, Ramos-Cartagena told an FBI

agent, "We were millionaires for a short time." The jury decided that statement was true.

**II.**

Many of the arguments are joined by several of the defendants and we cluster them. We deal first with jurisdictional arguments, then with evidentiary objections. As the defendants argue that their evidentiary objections are precursors to their sufficiency of the evidence arguments, we next deal with those sufficiency arguments. Finally, we address the Castillo and sentencing issues.

A. Jurisdiction: Whether the money stolen was insured by the FDIC or belonged to the United States

Counts 1 and 2 of the indictment, which alleged violations of 18 U.S.C. § 2113(a), (d), required the government to prove that the money taken during the robbery was insured by the FDIC. See United States v. Wood, 780 F.2d 555, 556 (6th Cir. 1986). At the close of the prosecution's case, Reyes-Hernandez and Ramos-Cartagena moved for acquittal under Federal Rule of Criminal Procedure 29, arguing that the government had failed to prove this essential element. The motion was denied, and they renew the argument on appeal.

-13-

It appears that the prosecution simply forgot to put on evidence as to FDIC insurance in its case in chief. Consequently, the defendants moved for entry of judgment of acquittal after the government rested. Recognizing its blunder, the prosecution requested that the court reopen the prosecution's case in chief to permit it to present such evidence or, alternatively, that the court take judicial notice of the fact that Banco Popular and Banco Santander are insured by the FDIC. The district court then indicated its inclination to reopen to correct a "purely technical" error and urged the parties to enter into a stipulation. The parties did enter into a stipulation, without prejudice to their appellate rights, that Banco Popular and Banco Santander were both insured by the FDIC. The stipulation was presented to the jury.

On appeal the defendants object to the trial court's intervention on this issue, saying the court assumed the role of the prosecution. We disagree and find that the district court did not abuse its discretion in deciding to reopen. See United States v. Santana 175 F.3d 57, 64 (1st Cir. 1999). There was no serious dispute that the banks were federally insured, and the government's lapse was recognized in time.

-14-

Count 3 of the indictment, which alleged a violation of 18 U.S.C. § 2114(a), required the government to prove that the money belonged to the United States. See United States v. Lawrence, 699 F.2d 697, 701-02 (5th Cir. 1983). With regard to his conviction on this count, Ramos-Cartegena presses two arguments. First, he says, § 2114 is limited to offenses having a "postal nexus," and, although the jury instruction indicated that the jury needed to find that postal service money was stolen, the indictment failed specifically to allege that the stolen money belonged to the United States Postal Service. Second, he says there was insufficient evidence for the jury to find that the money belonged to the United States Postal Service. In fact, there was testimony from a Loomis Fargo guard that he had stopped at a United States Post Office before the robbers emptied his truck of its contents at the depot, and documents were introduced estimating losses to the postal service of over $2 million. The evidence was sufficient, and the indictment, which referenced the statute and specifically charged the robbers with stealing money belonging to the United States, adequately and fairly charged the crime.

B. Evidentiary Rulings

We review the district court's evidentiary rulings for abuse of discretion.  See United States v. Lara, 181 F.3d 183, 195 (1st Cir.), cert. denied, 120 S. Ct. 432 (1999).

1. Admission of Hearsay Statement of Deceased Informant

At trial, FBI Agent Raymond Lopez testified that, as a result of information from a confidential informant, he prepared an affidavit that led to warrants to search the four main defendants' homes on May 23, 1997.  Agent Lopez said that the informant had provided information that was detailed, specific, and consistent with information that was not publicly available.  As a condition of the admissibility of Agent Lopez's testimony as to what he was told by the informant, the court inquired into why the informant was not available to testify. The response was that he had been murdered.  Defense counsel moved for a mistrial, which was denied, or for an instruction. The court, in response, simply instructed the jury that the reason the informant was not there was that he was dead.

Agent Lopez, over objection, testified that the informant had told him that two weeks before the robbery "this group" had stolen a white van in the metropolitan San Juan area in order to commit the Loomis Fargo robbery; that they had

-16-

tinted the windows of the van to make it look like a standard Loomis Fargo van; and that the van could be found at a K-Mart shopping plaza near the Loomis Fargo depot. The van was found there. The ostensible purpose of the testimony was to establish that the stolen van had been used in the robbery, and the agent never explicitly testified that the informant meant that the defendants on trial constituted "this group." The court found that the information from the informant had sufficient guarantees of trustworthiness to be admissible hearsay under Federal Rule of Evidence 807.

The court, apparently recognizing in hindsight the dangers posed by the testimony that the informant had been murdered, instructed the jury the next day that there was no claim that the informant's death was related to the case and that his death could not be considered against any defendant.

The defendants level two objections. First, they claim it was error for the court to have allowed the government to introduce evidence that the informant had been murdered. Second, they argue that the informants' statements did not meet the trustworthiness requirements established under <u>Ohio</u> v. <u>Roberts</u>, 448 U.S. 56, 66 (1980). This error, they say, denied

-17-

them their Sixth Amendment right to be confronted with the witnesses against them.  <u>See</u> <u>Lilly</u> v. <u>Virginia</u>, 527 U.S. 116, 139 (1999).

The testimony that the witness was unavailable because he had been murdered was unfortunate, and the trial judge's initial instruction was insufficient.  It would have been far better if the trial judge had immediately made clear that there was no claim, implicit or explicit, that these defendants were somehow responsible for the murder.  If matters had been left at that, the defendants would have a very serious claim.  But matters were not left at that; the court quickly corrected the error as its first order of business the next morning.  That was sufficient.

The second attack, based on Federal Rule of Evidence 807, rests on the premise that the informant's statements lacked common attributes of trustworthiness: the informant never gave his statement under oath, and he never claimed to be an eyewitness.  Moreover, his unavailability cannot be attributed to the defendants so as to warrant admission of his statement.

Under <u>Roberts</u>, hearsay statements are considered sufficiently trustworthy when the evidence either falls within

-18-

a firmly rooted hearsay exception or it possesses particularized guarantees of trustworthiness. See Roberts, 448 U.S. at 66. This test was recently reaffirmed in Lilly, which emphasized that appellate courts should conduct an independent review of the trustworthiness finding. See Lilly, 527 U.S. at 136. The informant's statements do not fall within the category of a firmly rooted hearsay exception, so we look for any guarantees of trustworthiness. The justification for a finding of trustworthiness in this case is very thin, and the record on the point is sparse. But this is not a case in which the issue is important to the outcome. The testimony was admitted primarily to show that the defendants stole the van (from which the inference could be drawn that they stole it to use in the robbery). This fact was established by evidence regarding the veterinary products (1) that the van's owner testified were in the van when it was stolen; (2) that Diaz-Nevarro saw in Ramos-Cartagena's house; (3) that the FBI found in Ramos-Cartagena's house; and (4) that the FBI found in the stolen van. Moreover, there was considerable other evidence linking the defendants to the robbery. If there was any error, it was harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18, 24

-19-

(1967).

2. <u>Admission of Statements of Witnesses Nevarez-Marrero and</u>
<u>Diaz-Nevarro</u>

Reyes-Hernandez and Mojica-Baez seek to raise an argument that had its brief moment in the sun but has since faded. The claim is that two prosecution witnesses received something of value from the government in return for their testimony, to wit, a reduced sentence and a cash stipend respectively, and that this violates 18 U.S.C. § 201(c)(2), which prohibits offering "anything of value" as an inducement to a witness. This court flatly rejected that argument in <u>Lara</u>, 181 F.3d at 197-98, and we do so here.

3. <u>Exclusion of Melendez testimony</u>

The defendants wanted to put on evidence from Tomas Melendez attacking the credibility of FBI agent Carlos Cintron, who gave testimony inculpating the defendants. In particular, they wanted to attack the investigation performed by the agent.

The issue of the exclusion of such evidence is, however, more complicated than that. The first salvo by the defense was to move to dismiss the second superceding indictment, supporting that motion with an affidavit from

Melendez to the effect that the indictment was based on statements from Melendez and that Melendez had been coached on what to say by agent Cintron. In response to this, the district court held an evidentiary hearing and heard Melendez testify. The court found that Melendez had committed perjury and ordered his imprisonment. The agent next testified. In the end, the government moved to dismiss the second superceding indictment and proceeded at trial only on the first superceding indictment.

Agent Cintron testified at trial. Cintron testified that he participated in the arrests of Ramos-Cartagena, Reyes-Hernandez, Mojica-Baez, and Vega-Coreano on May 28, 1997, at the Joyuda Beach Parador, and he identified evidence obtained at the time of the arrests. The evidence included false identification cards and a receipt for a May 21, 1997, cash purchase of two expensive watches, both found in Vega-Coreano's handbag; false identification cards in Ramos-Cartagena's wallet; more than $1,000 in cash taken from Reyes-Hernandez's person; and newspapers with stories about the Loomis Fargo robbery. Cintron also testified that Landa-Rivera provided a false name upon his arrest.

After the agent's examination, the defendants indicated

they wanted to subpoena the agent to testify in their case. The court, noting the agent had an obligation to testify in another court a few days hence, offered the defendants the opportunity to call him as their witness at that time. The court also noted that it would not permit testimony on the matters already covered at the evidentiary hearing, that is, matters regarding the second superceding indictment. At the end of the day, the defendants pressed the issue and said they wanted to inquire about the limits and inadequacy of the investigation. The trial judge said those matters could have been covered on cross-examination and that this agent played only a limited role in the investigation, but that he would allow the defendants to recall Agent Cintron if, after a proffer outside of the jury, he was convinced counsel was not attempting to reintroduce the Melendez issue related to the second superceding indictment.

Later in the trial, counsel for Ramos-Cartagena asked the court to permit Melendez to testify. The defense theory was that a cursory investigation had been done -- that once a few pieces of seemingly incriminatory evidence were found, the authorities concentrated on trying to link what was found in Ramos-Cartagena's house with the Loomis Fargo robbery. This,

-22-

they contended, evidenced bias by the government, and that bias was exemplified by Melendez being used by Cintron to obtain the second superceding indictment. The government responded that while that argument may have been relevant to the second superceding indictment, that indictment had been dismissed, and the argument was not relevant to the charges before the jury. Defense counsel countered that the testimony of two other witnesses buttressed their claim that the government had not adequately investigated the crime, and the government agreed that Agent Cintron could be brought back so those points could be pursued. The defendants pressed for permission to call Melendez as a witness, but the court refused, saying Melendez had committed perjury. Ramos-Cartagena, Reyes-Hernandez, and Mojica-Baez claim the district court erred in not allowing them to call Melendez as a witness.

The district court did not abuse its discretion. As the trial judge recognized, there was considerable danger in getting into a peripheral matter that had already been disposed of -- the second superceding indictment. The probative value of Melendez's testimony to the defendants' attempt to attack the government's investigation was weak, at best. The defendants

had a number of opportunities to make such an attack, some of which they took. They had the opportunity to recall agent Cintron and chose not take it. The trial judge's ruling, particularly with regard to a witness already determined to be a perjurer, was eminently reasonable.

We need not address the government's additional argument that the proposed Melendez testimony would be prohibited under Federal Rule of Evidence 608 as impeachment by extrinsic evidence.

4. Admission of Tools of the Trade

During the robbery, the gunmen bragged that they were "professionals." At trial, the government put in certain physical evidence seized from the defendants' homes on the theory that the items were the "tools of the trade" of professional robbers. The evidence included ski masks, bullets, a blue police emergency light, and police uniforms. There was no claim by the government that these were used during the Loomis Fargo robbery.

Reyes-Hernandez, Ramos-Cartagena, and Mojica-Baez claim the evidence is impermissible character propensity evidence barred by Federal Rule of Evidence 404(b) and that it should

-24-

have been excluded as overly prejudicial under Federal Rule of Evidence 403.

There was no error. Disguises are common tools of the trade and have been found admissible even if not used in the crime charged. <u>See, e.g.</u>, <u>United States</u> v. <u>Candelaria-Silva</u>, 162 F.3d 698, 705 (1st Cir. 1998). There was no unfair prejudice to the defendants.

5. <u>Admission of Redacted Post-Arrest Admission of Papo, a Co-Defendant Not On Trial</u>

Rafael A. Baez-Gonzalez was a charged co-defendant who was not on trial with these defendants. On May 23, 1997, FBI agents went to his house and found almost $400,000 hidden on the property. After he received his <u>Miranda</u> warnings, he signed a waiver of rights and gave a statement. Baez-Gonzalez's statement, redacted to remove the names of some of the defendants, was admitted at trial through the testimony of an FBI agent. The statement was that one week before the robbery an individual told Baez-Gonzalez that he (the individual) would be coming into some large money and asked Baez-Gonzalez whether he would hold the money for him; and further, that the Friday or Saturday after the robbery, the individual told Baez-Gonzalez that the money was from the Loomis Fargo robbery.

Baez-Gonzalez's redacted statement did not identify any of the defendants. Other evidence identified Mojica-Baez as the individual. Specifically, Nevarez-Marrero (the fellow jailmate) testified that Mojica-Baez had told him that "somebody had taken from one of his uncles almost half a million dollars, and he was thinking that his own uncle was squealing on him." Nevarez-

-26-

Marrero further testified that Mojica-Baez had told him that the money was "[f]rom the holdup" and that he (Mojica-Baez) had "given it to his uncle for safekeeping."  While there was an overruled objection to Nevarez-Marrero's statement, there was no objection to the FBI agent's testimony about Baez-Gonzalez's statement.  A <u>Bruton</u> objection was initially made to the Baez-Gonzalez statement, <u>see</u> <u>Bruton</u> v. <u>United States</u>, 391 U.S. 123 (1968), but it was withdrawn upon counsel's learning that the statement was redacted.[5]  Thus, there was no relevant objection to the Baez-Gonzalez statement, although the issue is now pursued on appeal by Mojica-Baez and Cartagena-Merced.

There was no clear theory of admissibility for Baez-Gonzalez's statement; there is no evidence from the record that the statement was admitted as a co-conspirator statement, and no <u>Petrozziello</u> ruling was made as to the statement.  <u>See</u> <u>United States</u> v. <u>Petrozziello</u>, 548 F.2d 20, 23 (1st Cir. 1977).  But the defendants did not make these points at trial and so are in a very weak position to argue them now.

The government urges that if there were any error, it

_____

[5]     Reyes-Hernandez initially objected on the assumption that the government was going to seek to introduce the statement as a declaration against interest.

-27-

was harmless. The defendants say that the claimed error was not harmless, because if the Baez-Gonzalez statement had not been admitted, the jury would have found that Nevarez-Marrero's statement, which was admissible, was not credible.

If there was any error, it was harmless. Baez-Gonzalez was Mojica-Baez's uncle; a huge and unexplained sum of money was found buried at his home; and, considering the other evidence that linked Mojica-Baez with the robbery, a jury could reasonably infer that it came from Mojica-Baez, whether or not Baez-Gonzalez's statement came in. The inference was given greater strength by Nevarez-Marrero's recounting of Mojica-Baez's own words.

## 6. Admission of Co-Conspirators' Statements

Mojica-Baez argues that it was a Petrozziello violation for the district court to allow Diaz-Nevarro to testify regarding statements made by co-conspirators after the robbery had been committed and to admit the statement Baez-Gonzalez gave following his arrest. See Petrozziello, 548 F.2d at 23. Baez-Gonzalez's statement, which was not explicitly admitted as a co-conspirator statement, was discussed above.

The main attack launched is that Diaz-Nevarro's

testimony involved statements that were made after the robbery and, thus, after the conspiracy ended.  There is a distinction, for purposes of the co-conspirator statement exception to the hearsay rule, between an initial conspiracy to commit a crime and later actions to conceal the crime.  See Grunewald v. United States, 353 U.S. 391, 399-406 (1957); Krulewitch v. United States, 336 U.S. 440, 443-44 (1949); United States v. Twitty, 72 F.3d 228, 233-34 (1st Cir. 1995).

Our review of the district court's determination that the statements were co-conspirator statements is for clear error.  See  United States v. Portela, 167 F.3d 687, 703 (1st Cir.), cert. denied, 120 S. Ct. 273 (1999).  The district court found that, in addition to the robbery, the conspiracy included the division and hiding of the money, a ruling that is plainly correct under United States v. Hickey, 596 F.2d 1082, 1089-90 (1st Cir. 1979).  It was hardly clear error for the district court to conclude that the robbers had not divided up all of the abundant cash by the night of the robbery or even immediately thereafter, and it is reasonable to conclude that it would have taken at least a few days to count $5.5 million. The statements

Diaz-Nevarro recounted were made well within this time frame.[6]

The district court also admitted the evidence on a theory that the conspiracy included the concealment of the crime.  The district court found that the conspiracy included "the use of false identifications by some of the defendants to hide their true identities and escape detection and punishment."  This ground is much more problematic in light of Krulewitch, 336 U.S. at 443-44, but the other ground suffices to admit the statements.

We do not reach the government's alternate ground, that the statements are admissible under Federal Rule of Evidence

---

[6]     Diaz-Nevarro testified as to two statements Vega-Coreano made to her.  Vega-Coreano told Diaz-Nevarro on the day of the robbery that Ramos-Cartagena and Reyes-Hernandez "went to Ponce" (the location of the robbery), and, when Diaz-Nevarro mentioned news coverage of the robbery, Vega-Coreano said "it was them."  The two Vega-Coreano statements are attacked as not being in furtherance of the conspiracy; but they may be understood as an effort by the one woman implicitly to secure the silence of the other.
          Mojica-Baez also challenges Diaz-Nevarro's testimony that, two days after the robbery, she overheard two of the conspirators describing to Vega-Coreano how a guard was hit.  Mojica-Baez describes the statement Diaz-Nevarro overheard as coming from Reyes-Hernandez and Landa-Rivera.  Diaz-Nevarro testified, however, that she heard Reyes-Hernandez making this statement.  We assume this is the statement to which Mojica-Baez raises an objection.  We do not decide whether this conversation was in furtherance of the conspiracy, as, even if it was error to admit the statement, any error was harmless in light of all the other testimony Diaz-Nevarro gave.

807, the residual hearsay exception.

7. Cumulative Evidentiary Errors

The defendants also appear to argue that even if any error in admitting a particular item of evidence was harmless, the cumulative effects of the errors denied them a fair trial. See United States v. Sepulveda, 15 F.3d 1161, 1195-96 (1st Cir. 1993). Given our rulings on the evidentiary issues and the very limited number of errors we have deemed harmless, there is nothing to this argument.

C. Limiting Instructions

Cartagena-Merced says instructions should have been given limiting to other defendants the testimony of Nevarez-Marrero, the flight evidence, and the evidence of use of false identification cards. No such limiting instructions were sought, and it was hardly plain error, much less an abuse of discretion, for the district court not to give those instructions sua sponte.

Cartagena-Merced also seeks to attack the admissibility of the Diaz-Nevarro testimony and the tools of the trade evidence, attacks that we have already rejected.

D. Sufficiency of the Evidence

## 1. Mojica-Baez

Mojica-Baez's defense theory apparently was that he was a 19-year-old innocent and that it was his 40-year-old uncle, Baez-Gonzalez, who was one of the robbers. There was evidence, though, that Mojica-Baez was at Ramos-Cartagena's house almost daily during the two weeks preceding the robbery, that he loaded weapons at the house the day before the robbery, and that, after the robbery, he embraced Vega-Coreano, saying "We did it. We did it," or "We won, we won." Mojica-Baez told Nevarez-Marrero that he (Mojica-Baez) had given his uncle money from the Loomis Fargo robbery for safekeeping and that he was worried his uncle was squealing on him. AK-47 ammunition and part of the barrel of an assault rifle were found in his home. Further, Mojica-Baez was arrested while traveling from hotel to hotel after the robbery with Ramos-Cartagena, Reyes-Hernandez, and Vega-Coreano. The evidence was sufficient.

## 2. Cartagena-Merced

Cartagena-Merced offered an alibi defense that he was at a birthday party for his mother the day of the robbery until some time after 8:00 p.m., and he produced a photograph allegedly showing him at the party. If he had been at the party

until at least 8:00 p.m., he could not have been at the robbery. Close scrutiny of the photo showed Cartagena-Merced was wearing a watch, and, according to the government's expert, the time on the watch was either 12:15 or 3:00.[7]  His false alibi was itself evidence of guilt.

Cartagena-Merced ultimately premises his insufficiency argument on the alleged "Limiting Instruction" errors discussed above.  There were no such errors and the argument fails. Cartagena-Merced was seen at Ramos-Cartagena's house regularly during the two weeks prior to the robbery; he arrived at the house just after the robbery with Mojica-Baez (who then embraced Vega-Coreano and exclaimed that they had been successful); and FBI agents found a McDonald's bag containing $2,500 hidden in a mattress and over $1,000 in a box and between the pages of a magazine at his house.  The evidence was sufficient to sustain the conviction.

---

[7]     Cartagena-Merced's expert stated that the watch showed 7:10. However, both Cartagena-Merced's expert and the government's expert agreed that the photo from the previous frame on the roll (which was not of Cartagena-Merced and which, if the photos in fact came from the same roll, had to have been taken prior to the photo of Cartagena-Merced) included a watch showing 7:50.  Thus, the jury was entitled to discredit Cartagena-Merced's expert's opinion that Cartagena-Merced's watch showed 7:10 and to infer that the photo of Cartagena-Merced was taken at 12:15 or 3:00 some time after the party.

E.  Sentencing

1. Use of Semi-Automatic Assault Weapon

Mojica Baez, Reyes-Hernandez, and Ramos-Cartagena say that they should not have been sentenced to the mandatory ten years imprisonment on Count 5 of the indictment for use of a semiautomatic assault weapon.  See 18 U.S.C. § 924(c)(1)(A), (B).  Use of an ordinary firearm results in a sentence of not less than 5 years imprisonment.  See id. § 924(c)(1)(A). Subsection (B) of the statute provides, in relevant part:

> If the firearm possessed by a person convicted of a violation of this subsection -- (i) is a short-barreled rifle, short-barreled shotgun, or semiautomatic assault weapon, the person shall be sentenced to a term of imprisonment of not less than 10 years . . . .

Id. § 924(c)(1)(B).  A violation of § 924(c)(1) was charged in the indictment without reference to subsection (B) and without any reference to the type of weapon used.  Reyes-Hernandez made an objection at sentencing that there was inadequate evidence to support the conclusion that a semiautomatic assault weapon was used.

a. Effect of Castillo

After this appeal was briefed, the Supreme Court

-34-

decided that the distinctions in 18 U.S.C. § 924(c)(1) between types of firearms (which result in different sentences), were elements of separate crimes and not just sentencing factors. See Castillo v. United States, 120 S. Ct. 2090, 2091 (2000). This means that the question of whether a firearm is a semiautomatic assault weapon must (1) go to the jury, not the judge, and (2) be proven beyond a reasonable doubt, not by a preponderance of the evidence, as is true with sentencing factors. See Apprendi v. New Jersey, 120 S. Ct. 2348, 2362-63 (2000) ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."); Sustache-Rivera v. United States, No. 99-2128, 2000 WL 1015879, at *1 (1st Cir. July 25, 2000). At our request, counsel filed supplemental briefs on the effect of Castillo on this case.

The only objections at sentencing regarding the § 924(c)(1) conviction did not encompass Castillo's distinction between sentencing factors and elements.[8] Nor were the arguments

---

[8]    Although Reyes-Hernandez argues that his objection at sentencing -- that there was insufficient evidence with regard to the type of the weapons used -- encompassed Castillo's distinction between

-35-

in the initial briefs on appeal addressed to this point.  As a result, our review of this type of trial error is for plain error.  Plain error review requires four showings: that there was error; that it was plain; that the error affected substantial rights; and that the error seriously affected the fairness, integrity or public reputation of judicial proceedings.  See Johnson v. United States, 520 U.S. 461, 467 (1997); United States v. Olano, 507 U.S. 725, 732 (1993).  The first two criteria are met here;  there was error, and it was plain, at least by the time of argument on the direct appeal. See Johnson, 520 U.S. at 468.

The "affecting substantial rights test" for trial error means that the error must have caused prejudice.  See Olano, 507 U.S. at 734.  However, unlike the harmless error test, in which the government bears the burden of showing that an error did not result in any prejudice, the defendant bears the burden of showing prejudice under the plain error test.  See id.  Thus, the "affecting substantial rights" prong of the test is not satisfied simply by showing that an element of an offense was

---

a sentencing factor and an element of the crime, that objection clearly did not address the point.

not submitted to the jury.  See <u>United States</u> v. <u>Pérez-Montañez</u>, 202 F.3d 434, 442 (1st Cir. 2000), <u>petition for cert. filed on</u> July 5, 2000 (U.S. No. 00-5096); <u>see also</u> <u>Neder</u> v. <u>United States</u>, 527 U.S. 1, 15 (1999) (holding that failure to submit an element to the jury is trial error, subject to harmless error review).  Instead, to show prejudice, the defendants must demonstrate that the error "affected the outcome of the district court proceedings."  <u>United States</u> v. <u>Colón-Muñoz</u>, 192 F.3d 210, 222 (1st Cir. 1999) (internal quotation marks and citation omitted), <u>cert. denied</u>, 120 S. Ct. 1559 (2000).

The trial error alleged under <u>Castillo</u> is the failure to have submitted the question of whether the robbers used a semiautomatic assault weapon to the jury.  We ask, then, what prospects there were that submission of the question to the jury would have resulted in a different outcome, keeping in mind the higher standard of proof required before a jury.  None of the defendants' briefs address the key question: whether, given the evidence actually introduced as to the weapons used, there was any prejudice from the failure to have submitted the question to the jury.  Rather than treat the issue as waived, we address it. One of the Loomis Fargo guards testified at trial that one of

the robbers was carrying an AK-47. The robbers twice told the guards they had AK-47 rifles, and AK-47 rounds were found at some of the defendants' homes. One of the robbers claimed that his weapon could shoot through cement, and an FBI firearms instructor testified that an AK-47 round is capable of penetrating cement. The FBI firearms instructor also testified that the weapon in the photograph of Ramos-Cartagena was an AK-47. He further testified that an AK-47 can operate either as a semiautomatic or as a fully automatic weapon. In light of this evidence, the defendants have not met their burden of showing prejudice, nor would we, applying the fourth <u>Olano</u> factor, find any miscarriage of justice.

The defendants' main argument, though, is based upon the fact that the indictment only charged them with a violation of § 924(c)(1) for use of a firearm during the robbery, but did not specifically charge them with a violation under subsection (B) of the statute or state that a semiautomatic assault weapon was used in the robbery. They urge, therefore, that this is not an instance merely of trial error. This requires, they say, that their convictions for the § 924(c)(1) violation be

reversed,[9] because such indictment errors are not subject to harmless or plain error analysis.  In other words, they claim that the indictment was fatally deficient, and that this, per se, requires reversal.  They do not argue that the indictment failed to provide them with fair notice of the charge against them.

Mojica-Baez cites to some recent cases for the proposition that omission of an element from an indictment is never harmless error.  He relies on United States v. Du Bo, 186 F.3d 1177 (9th Cir. 1999) (reversing conviction and dismissing indictment for failure to include element of the charged offense), but that case involved a timely pre-trial challenge to

---

[9]      Defendants' choice of remedy is overreaching.  There is no question that the indictment fairly and adequately charged them with the basic "use of a firearm" offense under § 924(c)(1)(A).  And there is no question that the government proved the elements of that offense beyond a reasonable doubt and that the elements were found by the jury.  In fact, there were no objections to the sentencing for the firearm offense until the government requested that the court sentence the defendants to the longer term pursuant to the semiautomatic assault weapon subsection of the statute, and the objections went only to the sufficiency of the evidence.
        As a result, the only possible relief for the defendants would be a remand for reindictment, see United States v. Spinner, 180 F.3d 514, 517 (3rd Cir. 1999), or resentencing, see United States v. Rudisill, No. 99-4588, 2000 WL 620314, at *1 (4th Cir. May 15, 2000) (per curiam) (unpublished); United States v. Matthews, 178 F.3d 295, 301 (5th Cir.), cert. denied, 120 S. Ct. 359 (1999).  We do not decide whether the proper remedy would be remanding for reindictment or for resentencing.

a deficient indictment. See id. at 1179. The case expressly limits its analysis to timely challenges. See id. at 1180 n.3. In a later unpublished opinion, that court declined to abandon harmless error analysis where the claim was not timely made at or before trial. See United States v. Woodruff, No. 98-10358, 1999 WL 776213, at **1 n.5 (9th Cir. Sept. 29, 1999) (unpublished), cert. denied, 120 S. Ct. 2202 (2000). Closer to defendants' mark is the Tenth Circuit's recent decision in United States v. Prentiss, 206 F.3d 960 (10th Cir. 2000), vacating a conviction based on a post-conviction challenge to an indictment that had failed to include an element of the crime charged.[10] See id. at 966. The court described the indictment's failure to include all of the essential elements of the offense and the indictment's lack of other language that would have remedied the omission as a "fundamental jurisdictional defect that is not subject to harmless error analysis." Id. at 975. Prentiss was decided over an argument in dissent that the decision was inconsistent with Neder. See Prentiss, 206 F.3d at

---

[10]    It is not clear from the Prentiss opinion whether the court vacated the conviction or reversed the conviction. The court simply stated that it was vacating the conviction and remanding for further proceedings, but in the following sentence it stated that it was reversing the conviction. See Prentiss, 206 F.3d at 977.

978-79 (Baldock, J., dissenting).  The majority thought <u>Neder</u> was inapplicable, primarily because <u>Neder</u> involved a failure to submit an element of an offense to a petit jury rather than to a grand jury.  <u>See</u> <u>Prentiss</u>, 206 F.3d at 977 n.14.  Furthermore, the Third Circuit vacated a guilty plea in <u>United States</u> v. <u>Spinner</u>, 180 F.3d 514 (3rd Cir. 1999), remanding so that the defendant could be reindicted where the original indictment had failed to allege the interstate commerce element of the crime. <u>See</u> <u>id.</u> at 517.  <u>Spinner</u> did not mention <u>Neder</u> and was concerned with an element that went to the constitutionally required basis for federal jurisdiction.  In addition, in <u>United States</u> v. <u>Rudisill</u>, No. 99-4588, 2000 WL 620314 (4th Cir. May 15, 2000) (unpublished), the court vacated a sentence where the indictment had not referenced the statutory section.  <u>See</u> <u>id.</u> at *1. <u>Rudisill</u> also did not discuss <u>Neder</u>.[11]

    We accept as true two general propositions.  Those

---

    [11]    These cases may be part of a renewed interest in the role of the grand jury as a bulwark against prosecutorial abuse.  <u>See generally</u> National Ass'n of Criminal Defense Lawyers, <u>Federal Grand Jury Reform Report & 'Bill of Rights'</u> (2000).  As the <u>Du Bo</u> court noted, "[a]t common law, 'the most valuable function of the grand jury was . . . to stand between the prosecutor and the accused, and to determine whether the charge was founded upon credible testimony . . . ."  <u>Du Bo</u>, 186 F.3d at 1179 (quoting <u>Hale</u> v. <u>Henkel</u>, 201 U.S. 43, 59 (1906)).

propositions do not mean, though, that the defendants' argument is sound. The first proposition is that an objection that an indictment fails to state an essential element of an offense "shall be noticed by the court at any time during the pendency of the proceedings." Fed. R. Crim. P. 12(b)(2). This means that the defendant may raise the objection for the first time on appeal or that this court may raise the issue sua sponte. See United States v. Forbes, 16 F.3d 1294, 1297 (1st Cir. 1994); United States v. Seuss, 474 F.2d 385, 387 n.2 (1st Cir. 1973). The second proposition is that a statutory citation standing alone in an indictment does not excuse the government's failure to set forth each of the elements of an offense. See Forbes, 16 F.3d at 1297; United States v. McLennan, 672 F.2d 239, 243 (1st Cir. 1982). An indictment may incorporate the words of a statute to set forth the offense, but the statutory language "must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged." Hamling v. United States, 418 U.S. 87, 117-18 (1974) (quoting United States v. Hess, 124 U.S. 483, 487 (1888)) (internal quotation marks omitted). We do not decide here

-42-

whether the indictment was defective or inadequate for its failure to do more than refer to the "use of a firearm" statute in the context of accusing defendants of using a firearm in the robbery, see id. (stating that, to be adequate, indictment must fairly inform a defendant of the charges against him and enable him to assert a double jeopardy defense to future prosecution), but we take it that there is an argument that it was inadequate. The government's brief seems to assume, without analysis, that the indictment was inadequate.

The argument that the sentences should be vacated is premised upon the distinction between "trial error," which is reviewed for prejudice (discussed above), and the more fundamental "structural error," which is per se prejudicial. Certain categories of error interfere with such basic and fundamental constitutional protections that they go to the structure of our criminal law system. These "structural errors" require that convictions, or sentences, be set aside without any examination of prejudice because, among other things, it would be well-nigh impossible to determine the amount of harm. The harm caused by these types of error is surely great, though, as when a defendant is deprived of counsel, see Gideon v.

-43-

<u>Wainwright</u>, 372 U.S. 335 (1963), or when the trial judge is biased, <u>see</u> <u>Tumey</u> v. <u>Ohio</u>, 273 U.S. 510 (1927). Other errors have been designated as structural in order to vindicate compelling constitutional policies, such as freeing the trial and grand jury processes from state-sponsored discrimination in the selection of jurors, <u>see</u> <u>Vasquez</u> v. <u>Hillery</u>, 474 U.S. 254 (1986); preserving open and public trials, <u>see</u> <u>Waller</u> v. <u>Georgia</u>, 467 U.S. 39 (1984); and reinforcing the core of the principle of proof beyond a reasonable doubt in criminal cases, <u>see</u> <u>Sullivan</u> v. <u>Louisiana</u>, 508 U.S. 275 (1993).

The error in this case is not of that dimension. No interest in safeguarding fair trials or vindicating compelling constitutional policies would be served by classifying the error here as structural. Nor do we think the integrity of the judicial system is implicated. <u>See</u> <u>Johnson</u>, 520 U.S. at 469-70. The reason the indictment in this case did not specify that a semiautomatic assault weapon or AK-47 had been used in the robbery was that circuit precedent at the time did not require it. After the defendants in this case were convicted, but prior to their sentencing, we decided that § 924(c)(1)'s subsections defined sentencing factors and not elements of separate

-44-

offenses.  See United States v. Shea, 150 F.3d 44, 51 (1st Cir.), cert. denied, 525 U.S. 1030 (1998).  It is one thing to vacate a conviction or sentence where the prosecutor failed to indict in accordance with the current state of the law.  It is quite another thing to vacate a conviction or sentence based on an indictment that was entirely proper at the time.  Neither the prosecution nor defense counsel in this case anticipated that the Supreme Court would rule as it did in Castillo.

There are some serious harms, to be sure, that can emerge from flawed indictments.  The most serious may be when a defendant is without fair notice of the charges against him. See United States v. Murphy, 762 F.2d 1151, 1155 (1st Cir. 1985).  The defendants have not argued on appeal that they lacked fair notice.  Moreover, when the government requested that the defendants be sentenced pursuant to the semiautomatic assault weapon subsection, the defendants made no claim of lack of fair notice.  The § 924(c)(1) charge against the defendants put them on notice that they could be sentenced for using a semiautomatic assault weapon (pursuant to § 924(c)(1)(B)) if the judge found, by a preponderance of the evidence, that such a

weapon had been used.[12]  We see no unfairness to the defendants in terms of notice.

We think we are compelled by the Supreme Court's decision in Neder to subject the indictment error in this case to plain error review.  In Neder the court held that a jury instruction "that omits an element of the offense does not necessarily render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence" and is, therefore, subject to harmless error review.  Neder, 527 U.S. at 9.  This is so even though the Fifth Amendment requires the government to prove every element of a criminal offense beyond

_____

[12]     Whether the use of a semiautomatic assault weapon pursuant to subsection (B) of § 924(c)(1) was an element of a separate offense or a sentencing factor had not been decided in this circuit at the time of the defendants' trial.  Defendants had a great incentive to raise the issue because of the less rigorous standard of proof upon which a judge could make the finding at sentencing.  However, we had already decided, in an analogous context, that the subsections to the federal carjacking statute that provide for longer sentences where a victim suffers bodily injury were sentencing factors, not elements of an independent offense.  See United States v. Rivera-Gomez, 67 F.3d 993, 1000 (1st Cir. 1995).  Other circuits agreed.  See, e.g., United States v. Oliver, 60 F.3d 547, 552 (9th Cir. 1995); United States v. Williams, 51 F.3d 1004, 1009 (11th Cir. 1995).  These decisions were later overturned in Jones v. United States, 526 U.S. 227, 251-52 (1999).  With regard to § 924(c)(1)'s subsections, at the time of defendants' trial, there was a split among the circuits on the "sentencing factor vs. element" issue.  Compare United States v. Branch, 91 F.3d 699, 737-41 (5th Cir. 1996) (sentencing factor), with United States v. Alerta, 96 F.3d 1230, 1235 (9th Cir. 1996) (element).

a reasonable doubt, see In re Winship, 397 U.S. 358, 364 (1970),

and the Sixth Amendment requires that a jury, and not a judge,

find that the elements of the offense have been proven, see

Sullivan v. Louisiana, 508 U.S. 275, 277 (1993).  It is true, as

the majority in Prentiss says, that Neder was explicitly

concerned with the failure to submit an element of an offense to

the petit jury at trial and not with the failure to present an

element to the grand jury to secure an indictment.  See

Prentiss, 206 F.3d at 977 n.14.  But we do not think that

distinction is significant where the indictment provided the

defendant with fair notice of the charges against him.  The

Neder court explained that "most constitutional errors can be

harmless."  Neder, 527 U.S. at 8 (internal quotation marks and

citation omitted).

Prior to Neder, the Court had recognized other

constitutional errors that can be harmless.  See, e.g., Arizona

v. Fulminante, 499 U.S. 279, 310 (1991) (erroneous admission of

evidence in violation of Fifth Amendment guarantee against self-

incrimination may be harmless); Delaware v. Van Arsdall, 475

U.S. 673, 684 (1986) (erroneous exclusion of evidence in

violation of defendant's Sixth Amendment right to confront

-47-

witnesses may be harmless). Against this background, we see no reason why harmless error review should not apply to the failure to include an element in an indictment that otherwise provided the defendants with fair notice of the charges against them. Cf. United States v. Jackson, 214 F.3d 687, 690 (6th Cir. 2000) (suggesting that harmless error analysis might be appropriate where an element of an offense was not specifically included in the indictment or submitted to the jury).

This approach is consistent with circuit law concerning other defects in indictments. See, e.g., United States v. Yefsky, 994 F.2d 885, 894 (1st Cir. 1993) (applying harmless error review where indictment did not give the defendant adequate notice of the charges against him, but where adequate notice had been given prior to trial). Even where a defendant alleges that there was misconduct before the grand jury, the harmless error test applies. See United States v. Mechanik, 475 U.S. 66, 71-72 (1986); see also United States v. Lamela, 942 F.2d 100, 104 n.7 (1st Cir. 1991).

The evidence as to use of semiautomatic assault weapons was, at it happens, presented to the petit jury (we are doubtful that much rests on it being presented to the jury as opposed to

the judge).  That evidence may well have also been presented to the grand jury; we do not know.  There is no question that the petit jury in this case would have found that the defendants used at least one AK-47.  To paraphrase <u>Neder</u>, the indictment's failure to charge the defendants under the semiautomatic assault weapon subsection of the statute did not necessarily render the indictment unfair or make it an unreliable vehicle with which to commence the proceedings in this case.  <u>See</u> <u>Neder</u>, 527 U.S. at 9.  We reject the argument that <u>Castillo</u> requires the sentences be vacated based on an error in the indictment.

b.  <u>Sufficiency of the Evidence</u>

Viewing the issue not as a <u>Castillo</u> issue but simply as an issue of whether the trial judge's determination was sufficiently supported by the record, we find there was no error.  The 10-year sentences under § 924(c)(1)(B) for Ramos-Cartagena, Cartagena-Merced, Reyes-Hernandez, and Mojica-Baez are affirmed.

2.  <u>Landa-Rivera's Sentencing</u>

Landa-Rivera was convicted of being an accessory after the fact to the robbery, in violation of 18 U.S.C. §§ 3, 2113(a).  He makes two arguments on appeal.  First he says, and

the government agrees, that while he was charged and convicted for being an accessory to a simple robbery, see 18 U.S.C. § 2113(a), he was erroneously sentenced as though he were an accessory to an armed robbery, see 18 U.S.C. § 2113(d). The government asks that this aspect of the sentence be remanded for resentencing, and we do so.

Second, Landa-Rivera argues that the district court erred in calculating his total offense level. We review the applicability and interpretation of a sentencing guideline de novo, but we review the district court's factual findings at sentencing only for clear error. See United States v. Cali, 87 F.3d 571, 575 (1st Cir. 1996). Landa-Rivera makes two separate claims relating to the calculation of his offense level. First, he claims the court incorrectly increased his offense level for "specific offense characteristics that were known, or reasonably should have been known, by the defendant."[13] U.S.S.G. § 2X3.1, application note 1. According to Landa-Rivera, since being an

---

[13] Specifically, he asserts error for the following increases: five levels because of the use of firearms, under U.S.S.G. § 2B3.1(b)(2)(C); three levels because the guards were restrained and firearms were taken from them, under U.S.S.G. § 2B3.1(b)(4)(B), (b)(6); and two levels because the guards sustained bodily injuries, under U.S.S.G. § 2B3.1(b)(3)(A).

-50-

accessory after the fact is not itself a crime of violence, sentencing enhancements related to the violent nature of the robbery in this case should not apply to him. He is incorrect. The relevant Guidelines sections make clear that the specific characteristics of the underlying offense constitute relevant conduct for the purpose of calculating an accessory sentence. Application note 1 of § 2X3.1 (the accessory after the fact guideline) references § 1B1.3, application note 10, for purposes of computing the total offense level. That note, in turn, states, "In the case of . . . accessory after the fact, the conduct for which the defendant is accountable includes <u>all conduct relevant to determining the offense level for the underlying offense</u> that was known, or reasonably should have been known, by the defendant." U.S.S.G. § 1B1.3, application note 10 (emphasis added). As a factual matter, there was no clear error in finding that Landa-Rivera knew or should have known of these characteristics of the robbery. In fact, the record shows that Landa-Rivera recounted the details of the robbery to Nevarez-Marrero and Diaz-Nevarro.

Landa-Rivera's second argument is that there was insufficient evidence to support a finding that he knew or

should have known that the property of a financial institution was taken, see U.S.S.G. § 2B3.1(b)(1), and that the total losses were over $5 million, see U.S.S.G. § 2B3.1(b)(7)(H). There was no error. Landa-Rivera told Nevarez-Marrero that over $5 million had been stolen; there was ample evidence that much of the money came from banks -- Banco Popular and Banco Santander in particular; and it was reasonable for the trial judge to conclude that Landa-Rivera knew or should have known this information.

## III.

The convictions and sentences of defendants Mojica-Baez, Reyes-Hernandez, Cartagena-Merced, and Ramos-Cartagena are affirmed. Defendant Landa-Rivera's conviction is affirmed, but his sentence is vacated and remanded for resentencing in accordance with this opinion.

So ordered.