**UNITED STATES of America,**

v.

**Jonathan WILKES, Defendant.**

**No. CR. 97–10235–NG.**

United States District Court,
D. Massachusetts.

Feb. 20, 2001.

---

224

Stewart H. Grimes, New Bedford, MA, for Joseph Tremblay, Defendant.

Martin Boudreau, Milton, MA, for Paul Loura, Defendant.

Angela G. Lehman, Cullen & Resnick, Boston, MA, Elliot M. Weinstein, Boston, MA, for John Wilkes, Defendant.

James H. Fagan, Fagan & Goldrick, Taunton, MA, for Jodi King, Defendant.

Joan C. Stanley, Boston, MA, for Kenneth G. Perry, Defendant.

James P. Duggan, Boston, MA, for Robert Coute, Defendant.

Michael D. Ricciuti, United States Attorney's Office, Boston, MA, for U.S.

TABLE OF CONTENTS

I.   INTRODUCTION .............................................. 225

II.  FACTS ...................................................... 226
    A.  The Conspiracy to Distribute Marijuana ................ 226
    B.  The Conspiracy to Launder Money ..................... 227
    C.  The Indictment ...................................... 227
    D.  Wilkes' Guilty Plea .................................. 228
    E.  Wilkes' Background and Post-arrest Conduct ........... 228

III. CONSTITUTIONAL OBJECTION TO THE GUIDELINE RANGE OF IMPRISONMENT ............................................. 229
    A.  Apprendi and Its Progeny ........................... 230
        1.  Apprendi v. New Jersey ......................... 230
        2.  Post–Apprendi Developments ..................... 232
            a.  Apprendi's Application to Drug Quantity ........ 233
            b.  Apprendi's Extension to Indictments ........... 233
    B.  The Standard for Reviewing Indictment Errors ........ 234

   C.   Application of the First Circuit's Standard to Wilkes ........................238

IV.  ARGUMENTS FOR ADJUSTMENTS AND DEPARTURES ...................238
   A.   Upward Adjustment for Role in the Offense .............................239
   B.   Departure Based on Overstatement of Criminal History ....................239
   C.   Downward Departure Based on Extraordinary Post-arrest Rehabilitation.....240

V.  CALCULATION OF WILKES' SENTENCE .............................241
   A.   Count One .....................................................241
   B.   Count Two .....................................................241
   C.   Multiple Count Adjustment .......................................241
   D.   Adjustment for Acceptance of Responsibility ..........................241
   E.   Total Offense Level .............................................241
   F.   Criminal History Score ..........................................241
   G.   Guideline Sentencing Range.......................................241
   H.   Departures ....................................................241
      1.   Criminal History ...........................................241
      2.   Extraordinary Post-arrest Rehabilitation ..........................241

VI.  CONCLUSION ...................................................242

### SENTENCING MEMORANDUM

GERTNER, District Judge.

This memorandum concerns the sentencing of Jonathan Robert Wilkes ("Wilkes"). Wilkes pled guilty to one count of conspiracy to possess marijuana with intent to distribute, in violation of 21 U.S.C. § 846, and one count of conspiracy to launder money, in violation of 18 U.S.C. § 1956(h).

Wilkes' sentencing raises a number of important questions under the Constitution and the United States Sentencing Guidelines: Does the rule announced in *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) [hereinafter *"Apprendi"*], require the government to specify the quantity of marijuana in the indictment charging Wilkes with a violation of 21 U.S.C. § 846? If the indictment failed to do so, is the Court without jurisdiction to impose a sentence under 21 U.S.C. § 841(b)(1)(B)(vii) (a sentence triggered by a finding that the defendant distributed a specific quantity of marijuana)?

Apart from the *Apprendi* questions, the case also raises two general departure issues: Is Wilkes entitled to a downward departure from the applicable Guideline range based on his post-offense efforts to rehabilitate himself, or because his criminal history score overstates the seriousness of his criminal record?

For the reasons set forth below, I reject Wilkes' *Apprendi* objection to the enhanced sentence, but **GRANT** his motion for a downward departure [docket # 143].

## I. INTRODUCTION

The government seeks an enhanced sentence in excess of five years incarceration on the basis of the amount of marijuana involved in Wilkes' § 846 offense.[1] *See* 21 U.S.C. § 841(b)(1)(B)(vii). Wilkes opposes the enhanced sentence because the government's failure to bring the question of quantity before the grand jury violates his Fifth Amendment rights to due process of law and to a grand jury indictment. U.S. Const. amend. V; *cf. Apprendi,* 120 S.Ct. at 2362–63; *United States v. Tran,* 234 F.3d 798 (2d Cir.2000) [hereinafter *"Tran"*].

First, I find the following rule governs § 846 drug prosecutions: The indictment must specify the amount of drugs involved in the conspiracy if the government seeks an enhanced sentence under § 841(b)(1) on

---

**1.** Section 846 does not contain a separate penalty provision. Instead, that section directs the Court to the penalty provisions of 21 U.S.C. § 841(b)(1). *See* 21 U.S.C. § 846.

the basis of that fact.[2] *United States v. Shepard*, 235 F.3d 1295, 1297 (11th Cir. 2000) [hereinafter *"Shepard"*]; *United States v. Doggett*, 230 F.3d 160, 164–65 (5th Cir.2000) [hereinafter *"Doggett"*]. Since the government here seeks to increase the maximum penalty to which Wilkes is exposed on the basis of a fact not specified in the indictment (i.e., the amount of marijuana), the indictment is deficient under *Apprendi*, and Wilkes' Fifth Amendment rights are violated. *Cf. Terry*, 240 F.3d at 74 (finding *Apprendi* indictment error harmless under the circumstances of that case) *United States v. Mojica–Baez*, 229 F.3d 292, 310 (1st Cir.2000) (same) [hereinafter *"Mojica–Baez"*].

At the same time, I am obliged by First Circuit precedent to find that the instant indictment error is harmless. *See Terry*, 240 F.3d at 74; *Mojica–Baez*, 229 F.3d at 310–11. The First Circuit has held that despite the fact that the grand jury did not have an opportunity to screen the issue, and despite the centrality of the issue of drug quantity to the defendant's sentence, this defect is not jurisdictional and does not preclude an enhanced sentence under 21 U.S.C. § 841(b)(1). *Terry*, 240 F.3d at 75. Rather, the omission of drug quantity is, like trial errors, subject to harmless error analysis. By that standard, the present error is harmless.

Finally, with regard to the actual sentence to be imposed on Wilkes, I agree

that his post-arrest efforts at rehabilitation are truly "extraordinary," far exceeding my expectations for the typical offender. I also find that Wilkes criminal history score overstates the seriousness of his criminal record. Thus, Wilkes' motion for a downward departure is allowed on those two grounds. He is sentenced to the mandatory minimum sentence of five years.

## II. FACTS

Wilkes was a participant in a conspiracy to purchase marijuana in southern California, primarily in the San Diego area, and to ship the marijuana to the Taunton, Massachusetts, area for distribution. The conspirators in Massachusetts then returned a portion of the illicit proceeds to the conspirators in California by way of Western Union transfers or couriers. In total, approximately 750 pounds of marijuana were distributed during the charged conspiracy. The Court has already sentenced twenty-two defendants charged in this and a related case.[3]

### A. The Conspiracy to Distribute Marijuana

Wilkes' tale begins with his co-defendant, Joseph Tremblay ("Tremblay"), a marijuana dealer who operated in Taunton, Massachusetts. Prior to the events underlying the instant indictment, Tremblay was involved in numerous other drug traffick-

2. Technically, the First Circuit has not reached this issue yet. *See United States v. Terry*, 240 F.3d 65, 74 n. 9 (1st Cir.2001) [hereinafter *"Terry"*]. Pre-*Apprendi* case law in the First Circuit held that drug quantity was a "sentencing factor," not an element of 21 U.S.C. § 841(a) and § 846 offenses. *United States v. Lindia*, 82 F.3d 1154, 1160 (1st Cir.1996) [hereinafter *"Lindia"*]. Under *Lindia*, the amount of drugs did not need to be specified in the indictment nor proven to a jury beyond a reasonable doubt. While the First Circuit has not expressly overruled *Lindia*, the court has recognized that the *Apprendi* rule alters the drug quantity analysis in

§ 841 and § 846 cases: "The rule in *Apprendi* ... applies in situations where the judge-made factual determination increases the maximum sentence beyond the statutory maximum, and not in situations where the Defendant's potential exposure is increased within the statutory range." *United States v. Baltas*, 236 F.3d 27, 41 (1st Cir.2001). To the extent that *Apprendi* conflicts with *Lindia* in some circumstances, *Apprendi* obviously controls.

3. *United States v. Duarte et al.*, Crim. No. 97–10234, included the Taunton defendants. The instant case, *United States v. Tremblay et al.*, Crim. No. 97–10235, included Wilkes and the California participants.

ing conspiracies that are the subject of a related case.[4]

In or about April 1994, Tremblay contacted co-defendant Paul Loura ("Loura") in California to establish a new marijuana supply for Tremblay. Loura and Tremblay established at least two sources of marijuana shortly thereafter. Wilkes became one of them.

In May 1994, Loura asked co-conspirator Michelle Reilly ("Reilly") if she would receive packages of marijuana for Tremblay in exchange for $500 per package. Reilly agreed. From May through September, Loura sent Reilly two or three packages of marijuana per month for Tremblay.[5] After receiving the packages, Reilly would contact Tremblay. Either Tremblay or co-defendant Robert Coute ("Coute") would pick up the packages from Reilly.

At some point prior to Labor Day weekend in 1994, Wilkes began shipping marijuana to Tremblay. From September through November, Wilkes sent Reilly approximately one package of marijuana per week. In September 1994, Tremblay also recruited another co-defendant, Kenneth Perry ("Perry"), to receive packages for Tremblay. At one point, Wilkes shipped a five-pound package of marijuana to Perry in Taunton, Massachusetts.

In November 1994, Tremblay arranged for Reilly to live with Wilkes in San Diego for several weeks. During this period, Reilly mailed several packages of marijuana to Tremblay on Wilkes' behalf. Eventually, Wilkes and Reilly had a falling out; Reilly moved into a hotel. Her activities on behalf of Wilkes subsequently decreased and, by January 1995, ended entirely.

In total, Reilly estimates that she mailed twenty to twenty-five packages to Massachusetts on behalf of Wilkes.

In March 1995, Reilly moved back to Taunton and began to receive occasional packages from Wilkes. In June 1995, Reilly recruited co-defendant Jodi King ("King") to receive packages for Tremblay. The conspiracy continued until November 1995, at which point Tremblay and Wilkes learned the FBI was investigating them.

### B. *The Conspiracy to Launder Money*

Tremblay paid Wilkes for the marijuana by courier and by Western Union transfers. At least two people, Chris Valenti and Jamin Hazelaar, traveled to Massachusetts with, or on behalf of, Wilkes to obtain cash Tremblay owed Wilkes. Sometimes Western Union transfers were sent directly to California conspirators in Tremblay's name. Some transfers were sent by Reilly and others in Massachusetts.

Wilkes occasionally received transfers in his own name, but he also recruited other individuals to receive the drug proceeds, including his then girlfriend, Melissa Dains ("Dains"), and his friend, Mike Randall ("Randall"). Wilkes received at least seven Western Union transfers in November 1994 and August 1995, reflecting approximately $20,000. Dains received at least two transfers; Randall received one. In sum, documents and testimony reflect that Tremblay and his co-conspirators transferred approximately $114,000 to co-conspirators in California.

### C. *The Indictment*

On September 11, 1997, a federal grand jury returned a three-count indictment against Tremblay, Loura, King, Perry, Coute, and Wilkes. The indictment charged defendants with: (1) Conspiracy to possess marijuana with intent to distribute, in violation of 21 U.S.C. § 846; (2) conspiracy to launder money, in violation of 18 U.S.C. § 1956(h); and (3) possession of marijuana with intent to distribute, in

---

4.  Crim. No. 97–10234.

5.  Some of this marijuana originated with an unindicted co-conspirator in California, not Wilkes.

violation of 21 U.S.C. § 841. Wilkes is charged in Counts One and Two. Nowhere does the indictment specify the quantity of marijuana Wilkes conspired to distribute.[6]

### D. Wilkes' Guilty Plea

Wilkes was arrested in Vermont on October 17, 1997. On November 30, 1999, Wilkes entered a plea of guilty on Counts One and Two. His plea agreement with the government sets forth the maximum penalty on Count One as not more than forty years imprisonment, and on Count Two as not more than twenty years. In his plea agreement, Wilkes expressly agrees that he is responsible for conspiring to distribute between 100 and 400 kilograms of marijuana, and for laundering less than $100,000. At the plea colloquy before this Court, Wilkes admitted his responsibility for conspiring to distribute between 100 and 400 kilograms of marijuana.

### E. Wilkes' Background and Post-arrest Conduct

Wilkes began experimenting with alcohol at the age of twelve, and marijuana at the age of thirteen. By the time Wilkes was fifteen, he abused alcohol and marijuana on a daily basis. In high school, Wilkes participated in several months of substance abuse counseling in Bristol, Connecticut. He remained sober for approximately one year but eventually relapsed.

In 1990, at the age of eighteen, Wilkes moved out of his parents' home in Connecticut and relocated to California. Wilkes intended to enroll in school in California, but instead started down an unfortunate and dangerous path. Throughout the early 1990s, he drank an average of twelve beers per day, and eventually began to abuse hard liquor. He smoked marijuana every day. In 1993, Wilkes' substance abuse also included crack cocaine on a weekly basis. By 1994, Wilkes was using heroin sporadically. In short, throughout the seven years before his arrest in 1997, Wilkes was severely addicted to drugs and alcohol.

During this time, Wilkes never maintained steady employment, or even a long-term residence. He did not maintain healthy or significant personal relationships with family and friends. His nomadic and self-destructive lifestyle soon became a life of crime. The facts relevant to this prosecution show that Wilkes, at least in part, supported himself through the sale of marijuana.

Following his arrest, everything changed. The Court ordered Wilkes into an inpatient drug treatment program as a condition of his release. In November 1997, he completed a program at Gosnold Treatment Center. Subsequently, in January 1998, he completed a residential treatment program at Steven Miller House. So severe was Wilkes' addiction that upon his release, counselors at Steven Miller House noted his prognosis for full recovery as "marginal."

After Wilkes' release on an unsecured bond, Wilkes moved into a house in New Jersey with his girlfriend, Cynthia Carr, and his grandmother, Susan Killoran. He developed significant and healthy personal relationships with Ms. Carr, his grandmother, and his two younger brothers in Connecticut.

Of special note is Wilkes' relationship with his 82–year–old grandmother. He devotes much time and effort to assisting his grandmother with household maintenance, doctors' appointments, meals, and many other aspects of her daily life. He rides his bicycle to and from work each day at lunch hour to check on his grandmother.

---

6. The government appended a "Notice of Applicability of 21 U.S.C. § 841(b)(1)(B)(vii)" to Count One of the indictment. The Notice informs Wilkes that the government intends to seek the mandatory minimum penalty of five years' imprisonment on account of the amount of marijuana involved in the conspiracy. The government does not represent that it submitted this Notice to the grand jury.

But the most surprising development, notwithstanding the dire predictions of the Steven Miller House staff, is the fact that Wilkes has been clean and sober—never once failing a drug test—since his arrest. Wilkes has complied with all conditions of his release—three full years of total compliance. He continues outpatient treatment with Prevention Specialists, Inc., in New Jersey. His program sponsor writes that Wilkes is in the top one percent of recovering clients in the program, and is an outstanding example for other clients. Wilkes continues to attend three weekly Alcoholics Anonymous (AA) or Narcotics Anonymous (NA) meetings per week, which is not a requirement of his release.

For the very first time in his life, Wilkes has maintained steady employment. He holds a full-time job at Brielle Basin Marina, where he has received three pay raises. His job duties include boat and shipyard maintenance, work on the fuel dock, including handling cash and credit card transactions, and the placement and removal of boats from the water. The Marina's President, Frederick Ziemba, states: "We have found Jonathan to be an honest, trustworthy and courteous employee. We have only received compliments from our customers regarding Jonathan's work... We look forward to keeping Jonathan as a trusted employee."

Wilkes also holds a part-time job at Cardinal Yacht Sales, where he is responsible for the care and maintenance of yachts. The President of Cardinal, Robert Hoste, writes: "John is diligent, honest (as he has disclosed his past) and a hard worker. I truly believe that he is an asset to our community... Knowing his past, I have employed him without reservation." In the summer, Wilkes takes on additional part-time duties at the Manasquan River Club. His supervisor presents a complimentary letter indicating that Wilkes "has

a future with our company, as a full time year round employee."

Despite the tremendous demands his recovery, employment, and family responsibilities place on his time, Wilkes managed to obtain his General Equivalency Diploma ("G.E.D.") in 1999 and began a college education. He is enrolled at Brookdale Community College with a cumulative grade point average of 3.6. He spent two semesters part-time, then enrolled full-time with five courses last spring. A representative of Brookdale writes: "He displays a strong desire to counsel addicted clients and is pursuing our Human Services Degree in Addiction Studies. Jon hopes to go on to a four year school after Brookdale and earn a Bachelor's degree in the Human Services." Wilkes plans to transfer to Seton Hall University. He has obtained support from an enrollment representative there.

Wilkes' letters of support indicate that he has demonstrated a strong interest in eventually serving other persons with chemical addictions after he has overcome his own personal and legal troubles. The message I have received from probation officers, addiction counselors, employers, academic mentors, friends, and family is best summarized by a statement found in one of Wilkes' letters of support: "To disrupt his progress at this point would be unfortunate and counterproductive."

### III. CONSTITUTIONAL OBJECTION TO THE GUIDELINE RANGE OF IMPRISONMENT

Before I reach the question of whether Wilkes' background entitles him to a downward departure, I must first determine whether the appropriate starting point is the Guidelines sentencing range applicable under 21 U.S.C. § 841(b)(1)(B)(vii) or 841(b)(1)(D). Relying primarily on *Apprendi*[7] and a Second Circuit case, *Tran*, Wilkes argues that the

---

**7.** Apprendi did not assert a constitutional claim based on the omission of any reference to the sentence enhancement or racial bias in the indictment. *Apprendi*, 120 S.Ct. at 2356. Consequently, the *Apprendi* Court did not address the indictment question.

indictment is defective for failure to specify the quantity of marijuana for which the government seeks to hold him responsible.[8] In Wilkes' view, the indictment against him charges only conspiracy to distribute an unspecified quantity of marijuana. Since the quantity issue was not presented to the grand jury, Wilkes believes the Court does not have jurisdiction to apply a sentence in excess of the five-year maximum prescribed for the simple offense. 21 U.S.C. § 841(b)(1)(D).

The government opposes. Relying on *Mojica–Baez*, the government responds that the First Circuit expressly rejected Wilkes' jurisdictional objection. *See* 229 F.3d at 311. The government contends that the indictment error is amenable to harmless error review, and the Court should find the present indictment error to be harmless under *Mojica–Baez*.

The First Circuit's decision in *Mojica–Baez* compels me to agree with the government.

## A. *Apprendi and Its Progeny*

The *Apprendi* decision raises fundamental questions about the criminal justice process: What factors are appropriately characterized as sentencing factors? What factors are appropriately characterized as substantive offense factors? What limits are there to Congress' power to put a given factor in one category rather than the other?

Putting a factor in one category rather than another has important implications. When a factor is in the substantive category, defining an element of the crime, it is subject to the full panoply of protections under the Bill of Rights, including the right to a jury trial and the requirement of proof beyond a reasonable doubt. When it is characterized as a sentencing factor, it is subject to resolution by a judge, with fewer procedural safeguards.[9] While the *Apprendi* decision raises provocative questions, the outcome of this case is unaffected by it for the reasons discussed below.

## 1. *Apprendi v. New Jersey*

In *Apprendi*, the defendant challenged the sentence imposed following his plea of guilty to second-degree possession of a firearm for an unlawful purpose. 120 S.Ct. at 2352. Although the statutory penalty for this crime was five to ten years' imprisonment, the trial judge found, by a preponderance of the evidence, that Apprendi had violated New Jersey's hate crime statute by possessing the firearm with a racially biased purpose. The trial court enhanced Apprendi's sentence to twelve years. *Id.* The New Jersey Supreme Court affirmed Apprendi's sentence after conducting a multifactor inquiry. *Id.* at 2353. That court found that the hate crime provision did not create a separate offense calling for a separate penalty. Rather, the court found that the New Jersey legislature " 'simply took one factor that has always been considered by sentencing courts to bear on punishment and dictated the weight to be given that factor.' " *Id.*

The Supreme Court of the United States reversed and invalidated the New Jersey statutory scheme. As an initial matter, the Court expressed doubts about the state court's ruling that the hate crime statute described merely a sentencing factor as opposed to a separate, aggravated offense. *Id.* at 2363–64. The Court found that the defendant's intent in committing a crime (e.g., with a purpose to intimidate on the basis of race) "is perhaps as close as one might hope to come to a core criminal offense 'element.' " *Apprendi*, 120 S.Ct. at

---

8. Wilkes does not press an *Apprendi* argument as to the money laundering count. A factual determination of the amount of funds involved in a laundering conspiracy does not affect the prescribed statutory maximum penalty of twenty years. *See* 18 U.S.C. § 1956.

9. *See* Nancy Gertner, "Circumventing Juries, Undermining Justice: Lessons from Criminal Trials and Sentencing," 32 Suffolk U.L.Rev. 419, 426–28 (1999).

2364. As such, it is well-established that due process entitles "a criminal defendant to 'a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt.'" *Id.* at 2355–56 (quoting *United States v. Gaudin,* 515 U.S. 506, 510, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995)).

The Supreme Court, however, accepted the New Jersey court's finding that the legislature intended to treat the "purpose to intimidate" factor as a sentencing factor, requiring a factual determination by the trial judge, not the jury. The question, then, was "starkly" presented: Whether the Due Process Clauses of the Fifth and Fourteenth Amendments, and the notice and jury trial guarantees of the Sixth Amendment, entitled Apprendi to a jury determination of such bias on the basis of proof beyond a reasonable doubt. *Id.* at 2355.

The Court found that the New Jersey legislature did not have the power to label the biased purpose as a sentencing factor: "Despite what appears to us the clear 'elemental' nature of the factor here, the relevant inquiry is one not of form, but of effect—does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?" *Id.* at 2365. If the answer to that question is "yes," then the finding may not be made by a judge, upon a preponderance of the evidence. The Court, then, constitutionalized the rule it first announced in *Jones v. United States,* 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999) [hereinafter *"Jones"*]: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi,* 120 S.Ct. at 2362–63.

There is some ambiguity as to the basis for the *Apprendi* Court's conclusion that the defendant's biased purpose was an element of the offense, rather than a sentencing factor. Three currents of due process jurisprudence appear in the *Apprendi* decision:

(1) The impact analysis: This approach suggests that if the factor at issue has a substantial impact on the sentence, it must be considered an "element" of the offense. Like due process arguments, constitutional protection pivots on the impact the determination of a particular fact will have on the outcome. *E.g., Specht v. Patterson,* 386 U.S. 605, 609–10, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967). Unlike the statutory approach discussed below, the legislature cannot cure the problem by simply redrafting a provision (e.g., by explicitly making intent to harm minorities a penalty provision).

The *Apprendi* rule endorses a limited impact approach, which makes exceptions for at least one traditional "sentencing factor"—recidivism. *Apprendi,* 120 S.Ct. at 2362–63. The *Apprendi* Court hinged its ruling on the *effect* of the sentencing enhancement under New Jersey law, which "unquestionably ... turn[ed] a second-degree offense into a first degree offense, under the State's own criminal code." *Id.* at 2365. The New Jersey legislature did not have the power to label the fact of racial bias as a "sentencing factor" rather than an "element" of the offense, where its impact on the defendant's punishment was so critical. *Id.*

Justice Thomas' concurrence in *Apprendi* suggests a "pure" impact approach:

[I]f the legislature defines some core crime and then provides for increasing the punishment of that crime upon a finding of some aggravating fact—of whatever sort, including the fact of a prior conviction—the core crime and the aggravating fact together constitute an aggravated crime, just as much as grand larceny is an aggravated form of petit larceny. The aggravating fact is an element of the aggravated crime.

*Id.* at 2368–69 (Thomas, J., concurring).

(2) The statutory analysis: The linchpin under this approach is what the *statute*

itself describes—an offense element or a sentencing factor. *Id.* at 2365–66. Throughout the *Apprendi* opinion, the Court repeats the holding that other than the fact of a prior conviction, any fact that increases the prescribed *statutory* maximum penalty must be submitted to a jury and proven beyond a reasonable doubt. *Apprendi,* 120 S.Ct. at 2355, 2362–63. Essentially, the legislature may draft a statute so as to specify an element of the offense—regardless of whether the legislature labels a particular provision a sentencing provision or a substantive offense provision—by tying the maximum penalty ranges to a particular factual determination. In *Apprendi,* for example, the one statutory crime provision defined the crime of unlawful possession of a firearm, subject to one maximum penalty of ten years. *Id.* at 2352. A separate statute, the hate crime law, provided for an "extended term" of imprisonment of ten to twenty years if the defendant committed the crime with a "purpose to intimidate" on account of the "race, color, gender, handicap, religion, sexual orientation or ethnicity" of the victim. *Id.* As such, the "purpose to intimidate" factor, which distinguished possession *simpliciter* from hate crime possession, an aggravated form, constituted an element of the offense which must be submitted to a jury.

The limitation on this approach, as noted by Justice Breyer, is that legislatures may avoid *Apprendi*'s jury protections by returning to an indeterminate sentencing scheme. *See Apprendi,* 120 S.Ct. at 2399–2402 (Breyer, J., dissenting). If the legislature simply prescribes a broad penalty range, and leaves it to a sentencing commission or judges to specify where a given punishment should lie within that broad range, the *Apprendi* rule is inapplicable.

(3) The third approach, also reflected by the *Apprendi* holding, suggests that there are certain traditional sentencing factors and certain traditional substantive factors. A legislature's authority to mix the two categories is limited. Prior record, or more broadly, recidivism, may be treated as a sentencing factor. *Apprendi,* 120 S.Ct. at 2362–63; *Almendarez–Torres v. United States,* 523 U.S. 224, 247, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998). Other factors, such as the absence of the heat of passion, as in *Mullaney v. Wilbur,* 421 U.S. 684, 703–04, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), and intent, as in *Apprendi,* must be treated as substantive elements.

In *Apprendi,* the Supreme Court did not clearly reconcile the three approaches outlined above. The hate crime statute violated Apprendi's due process rights under all three: The impact analysis underscored the substantial enhancement in maximum penalty and sentence imposed occasioned by a finding of a biased purpose. *Apprendi,* 120 S.Ct. at 2365. The statutory analysis suggested the hate crime statute prescribed a separate, aggravated crime with its own maximum punishment. *Id.* at 2364. Finally, "intent" is a typical substantive factor rather than a sentencing factor. *Id.*

### 2. Post–Apprendi Developments

Whatever the ambiguity of *Apprendi*'s rationale, the circuits have unanimously held that in drug prosecutions under 21 U.S.C. §§ 841 and 846, the issue of drug quantity is a question for the jury if the government seeks an enhanced sentence based on that fact.[10] And, although

---

10. *United States v. Hishaw,* 235 F.3d 565, 575 (10th Cir.2000); *United States v. Flowal,* 234 F.3d 932, 936 (6th Cir.2000); *Doggett,* 230 F.3d at 164–65; *United States v. Nordby,* 225 F.3d 1053, 1058–59 (9th Cir.2000) [hereinafter "*Nordby*"]; *cf. United States v. Baltas,* 236 F.3d 27, 41 (1st Cir.2001) (upholding sentence where penalty imposed fell below maximum penalty regardless of quantity because "[t]he rule in *Apprendi* only applies in situations where the judge-made factual determination increases the maximum sentence beyond the statutory maximum"); *United States v. Williams,* 235 F.3d 858, 863–64 (3d Cir.2000) (same); *Shepard,* 235 F.3d at 1297 (same); *United States v. Aguayo–Delgado,* 220 F.3d 926, 932–33 (8th Cir.2000) (same) [hereinafter "*Aguayo–Delgado*"].

*Apprendi* did not specifically confront the indictment issue, the circuits also have held that *Apprendi* and *Jones* require grand jury indictment of each and every element.[11] *Apprendi*, 120 S.Ct. at 2362–63; *Jones*, 526 U.S. at 232, 252–53, 119 S.Ct. 1215.

The instant indictment, to the extent that it failed to specify the amount of marijuana charged, contravenes the requirements of *Apprendi.*

### a. *Apprendi's Application to Drug Quantity*

Neither § 841(a) nor § 846 contains a specific penalty provision. Instead, § 841(b) provides several distinct maximum penalties dependent upon several factors, one of which is the amount of drugs involved in the conspiracy or possession offense.[12] The government may seek to use the amount of drugs as a basis for increasing the statutory maximum penalty to which a defendant is exposed. When it does, the government must submit the question of drug quantity to the jury and prove the amount beyond a reasonable doubt. *E.g., Doggett*, 230 F.3d at 164–65; *Nordby*, 225 F.3d at 1059; *Aguayo–Delgado*, 220 F.3d at 933.

To be sure, 21 U.S.C. §§ 841 and 846 indicate Congress intended the drug quantity to be a sentencing factor, not a substantive element of the offense. While § 841(b) is entitled "Penalties," § 841(a) is entitled "Unlawful Acts." *Compare* 21 U.S.C. § 841(b), *with* 21 U.S.C. §§ 841(a)

and 846 (defining offense of attempt and conspiracy). Indeed, prior to *Apprendi,* First Circuit precedent held that "[d]rug quantity ... is not an element of the offense of conviction ... but is typically relevant only for determining the penalty." *Lindia*, 82 F.3d at 1160.

■ I conclude, however, as have other courts, that drug quantity functions as an element of the offense in some cases: Section 841 clearly calls for a factual determination regarding the quantity of the controlled substance, and that factual determination significantly increases the maximum penalty from five years under § 841(b)(1)(D) to forty years under § 841(b)(1)(B)(vii). I hold, therefore, that if the government seeks enhanced penalties based on the amount of the drugs under 21 U.S.C. § 841(b)(1)(A) or (B), this fact must be submitted to the petit jury and proven beyond a reasonable doubt. *Apprendi*, 120 S.Ct. at 2363; *Doggett*, 230 F.3d at 164–65.

### b. *Apprendi's Extension to Indictments*

While Wilkes pled guilty and waived his right to a jury determination of the quantity, he asserts his right to have the grand jury charge him with the amount of marijuana involved in the offense. He only has such a right, obviously, if the *Apprendi* rule includes the Fifth Amendment's right to presentment or indictment by a grand jury.[13]

---

**11.** *Mojica–Baez*, 229 F.3d at 310–11; *Shepard*, 235 F.3d at 1297; *Doggett*, 230 F.3d at 164–65; *Aguayo–Delgado*, 220 F.3d at 933.

**12.** For example, in § 841(a) marijuana cases, the maximum permissible sentence for the simple crime of possession (i.e., possession of an unspecified quantity of marijuana or an amount less than fifty kilograms) is five years imprisonment. 21 U.S.C. § 841(b)(1)(D). Section 841(b)(1) offers two other maximum penalties for aggravated possession. The court may impose a sentence up to forty years maximum if the defendant is found guilty of possessing 100 or more kilograms of marijuana, but less than 1000 kilograms of marijua-

na. 21 U.S.C. § 841(b)(1)(B)(vii). A finding of more than 100 kilograms of marijuana, as in Wilkes' case, also triggers a mandatory minimum of five years imprisonment. Alternatively, the court may impose a sentence up to life imprisonment if the defendant is found responsible for an offense involving 1000 or more kilograms of marijuana. 21 U.S.C. § 841(b)(1)(A)(vii). A finding of 1000 or more kilograms triggers a ten-year mandatory minimum.

**13.** The Fifth Amendment reads: "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, ... nor be

■ Post-*Apprendi* case law is settled on this point as well: The government must specify the amount of drugs in the indictment if the government is seeking an enhanced penalty based on the quantity of drugs. *See Terry,* 240 F.3d at 74 (finding the failure of the indictment to specify drug quantity to be harmless error under *Mojica–Baez* standard); *Shepard,* 235 F.3d at 1297; *Doggett,* 230 F.3d at 164–65; *Aguayo–Delgado,* 220 F.3d at 933. This rule follows from the constitutional concerns raised in *Jones* and *Apprendi. See Apprendi,* 120 S.Ct. at 2356–57, 2362 n. 15; *Jones,* 526 U.S. at 232, 243 n. 6, 252–53, 119 S.Ct. 1215; *see also Russell v. United States,* 369 U.S. 749, 763–64, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962) (the indictment must contain elements of the offense intended to be charged).

■ The present indictment, then, clearly is deficient. While the government seeks an enhanced sentence based on the quantity of marijuana under 21 U.S.C. § 841(b)(1)(B)(vii), the grand jury failed to charge any specific amount of marijuana in the indictment. Moreover, Wilkes did not waive his objection to the indictment error by pleading guilty to the § 846 offense as such errors may be noticed " 'at any time during the pendency of the proceedings.' " *Mojica–Baez,* 229 F.3d at 309 (citing Fed R.Crim. P. 12(b)(2)); *accord Tran,* 234 F.3d at 806 ("pleading guilty is *not* the equivalent of a waiver of the right to be charged by a grand jury"). The only remaining question is whether Wilkes is entitled to the relief he seeks—a term of imprisonment capped at five years.

deprived of life, liberty, or property, without due process of law ...." U.S. Const. amend. V.

14. Under 18 U.S.C. § 924(c)(1)(A), use of an ordinary firearm results in a sentence of not less than five years imprisonment. A finding that a defendant used a semiautomatic assault weapon increases the mandatory minimum sentence to ten years. 18 U.S.C. § 924(c)(1)(B).

## B. The Standard for Reviewing Indictment Errors

■ In *Mojica–Baez,* the First Circuit addressed the proper standard of review for indictments that are technically deficient under *Apprendi. See* 229 F.3d at 311. The defendants were convicted by a jury of several charges, including armed robbery and use of or carrying a firearm in relation to a crime of violence. *Id.* at 297. The district court sentenced several defendants to a mandatory ten-year term of imprisonment for use of a semiautomatic assault weapon during a crime of violence.[14] *See* 18 U.S.C. § 924(c)(1)(B). The district court, not the jury, made the § 924(c)(1)(B) determination upon a finding that the government proved the firearm "fact"—use of a semi-automatic assault weapon—by a preponderance of the evidence. The indictment, however, charged defendants with violations of § 924(c)(1) without reference to subparagraph (B), and without alluding to the type of weapon used. *Mojica–Baez,* 229 F.3d at 306.

After the appeal was briefed, the Supreme Court decided that the distinctions in § 924(c)(1) between the types of firearms were elements of separate crimes and not just sentencing factors. *Castillo v. United States,* 530 U.S. 120, 120 S.Ct. 2090, 2096, 147 L.Ed.2d 94 (2000); *Mojica–Baez,* 229 F.3d at 306. Under *Castillo* and *Apprendi,* the district court was required to submit the firearm question to the jury, subject to the proof-beyond-a-reasonable-doubt standard.[15] *Mojica–Baez,* 229 F.3d at 306. The First Circuit also agreed that the failure to specify the type of weapon in the indictment was error

15. The First Circuit reviewed the *Apprendi* trial error for plain error. *Mojica–Baez,* 229 F.3d at 306–07. The court found that the failure to submit the firearm issue to the jury was error, and that it was plain. But the court also found the defendants' substantial rights were not affected by the error in light of the overwhelming evidence showing defendants used an AK–47 assault weapon during the commission of the robbery. *Id.* at 307.

under *Apprendi*.[16] *Id.* at 309. The court then turned its attention to the question of whether the omission in the indictment was subject to harmless error review, or as defendants argued, *per se* prejudicial, a jurisdictional defect requiring reversal of their convictions.[17] *Id.* at 307–08.

At the outset, the court recognized a principle that seemed to contradict much of its later analysis. The court ruled that a defendant may raise an *Apprendi* objection to the indictment at any point in proceedings, including on appeal. *Id.* at 309. Moreover, a court may raise the issue *sua sponte*. *Id.* The court cited Federal Rule of Criminal Procedure 12(b)(2) for this principle, not constitutional concerns.[18]

Defendants relied on a recent series of circuit court decisions suggesting that the omission of an element from an indictment is never harmless error. *E.g., United States v. Prentiss*, 206 F.3d 960, 965–66, 975–77 (10th Cir.2000) (vacating a conviction where the indictment failed to allege essential element of Indian status of the victim or the defendant in arson prosecution) [hereinafter *"Prentiss"*]; *United States v. Spinner*, 180 F.3d 514, 516 (3d Cir.1999) (failure to allege interstate commerce element in indictment charging access device fraud deprived district court of jurisdiction over prosecution) [hereinafter *"Spinner"*].[19]

The First Circuit rejected the jurisdictional approach. *Mojica–Baez*, 229 F.3d at 311. Instead, it found the question turned on whether the indictment error should be classified as a "trial error," which is reviewed for prejudice, or a "structural error," which is *per se* prejudicial. *Id.* at 309.

The First Circuit concluded it was compelled by the Supreme Court's decision in *Neder v. United States*, 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999), to subject the indictment error in *Mojica–Baez* to plain error review. *Mojica–Baez*, 229 F.3d at 311. In *Neder*, the Supreme Court found that the failure to instruct a jury on an element of an offense is subject to harmless error review. 527 U.S. at 8–9, 119 S.Ct. 1827. The First Circuit recognized that *Neder* was expressly concerned with the presentation of elements to petit, not grand, juries: "But we do not think that distinction is significant where the indictment provided the defendant with fair notice of the charges against him." [20]

---

**16.** Technically, the First Circuit refused to decide whether the indictment was defective or inadequate. *Mojica–Baez*, 229 F.3d at 309. Instead, the court simply assumed the indictment was inadequate because the government assumed as much in its brief. *Id.* In any event, there is no reason to believe the indictment in this case is adequate in light of recent case law interpreting *Apprendi*.

**17.** The First Circuit noted that *Apprendi* and *Castillo* are trial-error cases, and as such, those cases do not inform the court what to do in claims of indictment error. *Mojica–Baez*, 229 F.3d at 308.

**18.** The First Circuit's rationale for this holding simply cannot be that Rule 12(b)(2) requires that result. *Cf. Mojica–Baez*, 229 F.3d at 309. Rule 12(b)(2) distinguishes between motions claiming indictment defects that must be brought before trial and those that raise jurisdictional errors which may be raised at any time. Thus, the conclusion that the issue can be raised at any time necessarily

implies a finding that there has been a jurisdictional defect. *See* Fed.R.Crim.P. 12(b)(2).

**19.** In my view, *Prentiss* and *Spinner* set forth a narrow rule: A district court lacks jurisdiction to convict and impose judgment where the indictment omits an essential element of the offense and fails to allege any federal crime whatsoever. *Prentiss*, 206 F.3d at 975; *Spinner*, 180 F.3d at 516. That rule does not benefit Wilkes. The indictment in this case, similar to the indictment in *Mojica–Baez*, adequately charges Wilkes with a federal offense—the simple crime of conspiracy to possess marijuana with intent to distribute. Both *Prentiss* and *Spinner*, however, do contain language that supports a more expansive rule. *Prentiss*, 206 F.3d at 965–66, 975–76; *Spinner*, 180 F.3d at 516.

**20.** In *Prentiss*, the Tenth Circuit expressly rejected the argument that *Neder* compels harmless error review of indictments that omit essential elements of the offense:

First, on its face, *Neder* applies to petit, not grand, juries. Second, an error in a petit

*Mojica–Baez,* 229 F.3d at 311. Thus, the court concluded the indictment error in *Mojica–Baez* was not of a structural dimension:

> No interest in safeguarding fair trials or vindicating compelling constitutional policies would be served by classifying the error here as structural. Nor do we think the integrity of the judicial system is implicated.... It is one thing to vacate a conviction or sentence where the prosecutor failed to indict in accordance with the current state of the law. It is quite another thing to vacate a conviction or sentence based on an indictment that was entirely proper at the time. Neither ·the prosecution nor defense counsel in this case anticipated that the Supreme Court would rule as it did in *Castillo.*

*Id.* at 310. The court upheld the defendants' sentences. *Id.* at 312.

> jury instruction is "simply an error in the trial process itself," which can be assessed in the context of the trial. Conversely, errors in a grand jury indictment allow only a "guess as to what was in the minds of the grand jury at the time...." Third, the Court focused on whether an error in a petit jury instruction would "necessarily render a trial fundamentally unfair." In the insufficient indictment context, the fact that a defendant received a fair trial and suffered no prejudice is "irrelevant."
> 206 F.3d at 977 n. 14 (citations omitted).

**21.** The facts of *Tran* closely track those of *Mojica–Baez.* The *Tran* defendants pled guilty to using or carrying a firearm in violation of 18 U.S.C. § 924(c). The indictment did not describe the type of weapon used or carried. Their ten-year mandatory consecutive sentences were based on the fact that the defendants used or carried a short-barreled rifle. *Tran,* 234 F.3d at 802–03. On appeal, the defendants challenged their sentences on the ground that the district court lacked the authority to impose punishment for anything other than the simple firearm offense, under § 924(c)(1)(A), due to the failure of the indictment to charge the aggravating fact.

The Second Circuit found plain error review to be inappropriate where the indictment omits an element of the offense because such a defect is "jurisdictional" in nature.

Wilkes argues that I should reject *Mojica–Baez* in favor of the Second Circuit's approach in *Tran*[21] and the Tenth Circuit's approach in *Prentiss. See Tran,* 234 F.3d at 809; *Prentiss,* 206 F.3d at 975. If it is true, as *Tran* and *Prentiss* suggest, that the omission of an element in the indictment limits the court's subject-matter jurisdiction to trying, convicting, and sentencing the defendant solely on the facts and offenses charged in the indictment, then it does not matter that the government provides adequate notice to the defendant apart from the indictment. The grand jury had no opportunity to screen the charges. The trial court lacks the authority to impose the enhanced penalty where, as here, the defendant has not waived his right to indictment by a grand jury. "Because the defect is jurisdictional, it cannot be cured by the absence of prejudice to the defendant." *Tran,* 234 F.3d at 809.

*Id.* at 806. To support its conclusion, the court cited the "long-established" notion "that an indictment is a prerequisite to jurisdiction over a criminal case in the federal courts." *Id.* at 807. The court relied primarily on *Ex parte Bain,* 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1887), and *Stirone v. United States,* 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), to reject the government's position that an indictment is only jurisdictionally defective if it charges no federal offense at all. *Tran,* 234 F.3d at 808. In keeping with the Supreme Court's characterization of the indictment as jurisdictional in nature and scope, the Second Circuit ruled:

> [T]he prosecution does not have jurisdiction to prosecute a defendant, and the district court does not have jurisdiction to try, convict, or sentence a defendant, for any offense other than the one charged in the indictment. In other words, the defendant cannot be "held to answer" for any offense not charged in an indictment returned by a grand jury.

*Id.* The district court's jurisdiction was limited to trying (or accepting a plea from) the *Tran* defendants, and thereafter convicting and sentencing them, on the offense charged in the indictment, namely the use or carrying of a simple firearm. *Id.* at 809. The Second Circuit then vacated the *Tran* sentences and remanded for resentencing based on their convictions for the simple firearm offense. *Id.* at 810.

Indeed, dicta in *Apprendi* suggests as much. In *Apprendi*, the Supreme Court discussed the strong preference for ceding fact-finding authority to juries, even where the exercise of that authority may be a formality, expressed in a long line of case law that dates to our Nation's founding.[22] *See* 120 S.Ct. at 2356–60. In one passage hinting at *Apprendi*'s indictment implications, the Supreme Court criticized its own discussion in *Almendarez–Torres* as having "virtually ignored" the pedigree of the grand jury pleading requirement: "The rule was succinctly stated by Justice Clifford in his separate opinion in *United States v. Reese*, 92 U.S. 214, 232–233, 23 L.Ed. 563 (1875): '[T]he indictment must contain an allegation of every fact which is legally essential to the punishment to be inflicted.' " *Id.* at 2362 n. 15. Undoubtedly, *Apprendi* displays a marked preference for the formality of jury proceedings.

Moreover, in conducting its harmless error analysis, *Mojica–Baez* allows a district court, *post hoc*, to review the willingness of the grand jury to charge an omitted fact that forms the basis of an enhanced sentence. *Mojica–Baez*, 229 F.3d at 311; *see also Terry*, 240 F.3d at 74. This aspect of the *Mojica–Baez* decision seems inconsistent with the Supreme Court's indictment jurisprudence:

If it lies within the province of a court to change the charging part of an indictment to suit its own notions of what it ought to have been or what the grand jury would probably have made it if their attention had been called to suggested changes, the great importance which the common law attaches to an indictment by a grand jury, as a prerequisite to a prisoner's trial for a crime, and without which the constitution says "no person shall be held to answer," may be frittered away until its value is almost destroyed.

*Stirone v. United States*, 361 U.S. 212, 216, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960) (quoting *Ex parte Bain*, 121 U.S. 1, 10, 7 S.Ct. 781, 30 L.Ed. 849 (1887)). The *Stirone* Court warned, "neither this nor any other court can know that the grand jury would have been willing" to charge a fact not found in the indictment. *Id.* at 217, 80 S.Ct. 270.

In effect, the First Circuit did precisely what *Stirone* proscribed when it speculated, in *Mojica–Baez*, "there is no reason to think the grand jury would have had any trouble in rendering an indictment specifying the weapons used, and there was no variance." *Mojica–Baez*, 229 F.3d at 311. Again, in *Terry*, the court wrote: "Nor is there any reason to believe that the grand jury would not have returned an indict-

---

**22.** The Court reviewed the practice at common law:

As a general rule, criminal proceedings were submitted to a jury after being initiated by an indictment containing "all the facts and circumstances which constitute the offence, ... stated with such certainty and precision, that the defendant ... may be enabled to determine the species of offence they constitute, in order that he may prepare his defence accordingly ... and that there may be no doubt as to the judgment which should be given, if the defendant be convicted."

*Id.* at 2356 (citing J. Archbold, *Pleading and Evidence in Criminal Cases* 44 (15th ed. 1862)). This practice at common law held true when indictments were issued pursuant to statute as well:

Just as the circumstances of the crime and the intent of the defendant at the time of commission were often essential elements to be alleged in the indictment, so too were the circumstances mandating a particular punishment. "Where a statute annexes a higher degree of punishment to a common-law felony, if committed under particular circumstances, an indictment for the offence, in order to bring the defendant within that higher degree of punishment, must expressly charge it to have been committed under those circumstances, and must state the circumstances with certainty and precision."

*Id.* at 2357.

ment including such amounts if requested." 240 F.3d at 74.

Finally, the failure to allege essential facts in the indictment does implicate the integrity of the judicial system. *Compare Stirone*, 361 U.S. at 216, 80 S.Ct. 270, *with Mojica–Baez*, 229 F.3d at 310. The system situates the grand jury between the prosecutor and the defendant for a compelling reason: To ensure that an impartial group of the defendant's fellow citizens, acting independently of the prosecutor and the judge, determines the facts and the offenses to be publicly presented against the defendant.[23] *Stirone*, 361 U.S. at 218, 80 S.Ct. 270. "The right to have the grand jury make the charge on its own judgment is a substantial right which cannot be taken away with or without court amendment." *Id.* at 218–19, 80 S.Ct. 270. In fact, the "[d]eprivation of such a basic right is far too serious to be treated as nothing more than a variance and then dismissed as harmless error." *Id.* at 217, 80 S.Ct. 270. Under *Mojica–Baez*, however, the prosecutor can do an end-run around the grand jury and cure crucial omissions just by notifying the defendant.[24] *Compare Mojica–Baez*, 229 F.3d at 310–11, *with Tran*, 234 F.3d at 808–09.

Nevertheless, I am obliged to apply the rule in *Mojica–Baez*.

### C. *Application of the First Circuit's Standard to Wilkes*

█ The government appended to the indictment a "Notice of Applicability" of 21 U.S.C. § 841(b)(1)(B)(vii). Wilkes accepted a plea agreement that specified the maximum punishment for Count One as forty years, not five years. At Wilkes' plea hearing, the government announced

the forty-year maximum applied. Finally, at the plea colloquy, Wilkes admitted he was responsible for conspiring to distribute between 100 and 400 kilograms of marijuana.

The government adequately provided Wilkes with notice that the government sought the § 841(b)(1)(B)(vii) enhancement, and that his admissions would trigger a sentence in excess of five years imprisonment. Wilkes makes no argument that a grand jury would not have found probable cause to charge him with 100 or more kilograms of marijuana. Nor does Wilkes claim he could meaningfully contest the quantity issue if the government were put to its burden at trial. I will hold Wilkes responsible for 100 to 400 kilograms of marijuana. A Guideline sentencing range in excess of five years imprisonment does not contravene Wilkes' constitutional rights. *See Terry*, 240 F.3d at 74; *Mojica–Baez*, 229 F.3d at 311.

### IV. *ARGUMENTS FOR ADJUSTMENTS AND DEPARTURES*

Having established that the sentence prescribed by the Guidelines does not violate the Constitution per *Apprendi*, I now turn to the parties' arguments for adjustments and departures. I agree with the government that Wilkes qualifies for a four-level upward adjustment for his role in the drug and money laundering conspiracies.

At the same time, I agree Wilkes is entitled to downward departures on two grounds. First, I depart down from Criminal History Category III to Criminal History Category I because Wilkes' criminal

---

**23.** For a more detailed discussion of the historical importance of the grand jury's role in the criminal justice system, see Akhil Reed Amar, *The Bill of Rights* 83–88, 200–02, 269–72 (1998).

**24.** To be sure, the First Circuit also highlighted the fact that the indictment in *Mojica–Baez* was entirely proper at the time it was filed. *Mojica–Baez*, 229 F.3d at 310. This fact,

however, does not alter the *Mojica–Baez* harmless error analysis: Even in cases where the indictment is filed post-*Apprendi*, a defendant clearly would not suffer prejudice as a result of the failure to charge all essential facts, so long as the government provides the defendant with adequate notice after indictment. *See id.* at 311.

history score vastly overstates the seriousness of his criminal record. Second, I depart down to the mandatory minimum of sixty months' incarceration on the basis of Wilkes' extraordinary post-arrest rehabilitation.

### A. Upward Adjustment for Role in the Offense

■ Under U.S. Sentencing Guidelines Manual section 3B1.1(a) ("U.S.S.G."), Wilkes can be fairly characterized as an "organizer" of criminal activity involving five or more participants. *See United States v. Tejada–Beltran*, 50 F.3d 105, 112 (1st Cir.1995) (holding that the key to determining whether a defendant qualifies as an "organizer" is not "direct control but relative responsibility"). Both conspiracies involved five or more participants, including the six co-defendants and various unindicted co-conspirators. Wilkes operated as one of Tremblay's main suppliers of marijuana. Wilkes purchased multiple-kilogram quantities of marijuana from his sources in southern California. Wilkes supervised Reilly and others in the shipment of marijuana to Massachusetts. He sent at least two individuals to Massachusetts to collect money Tremblay owed Wilkes. Wilkes directed Melissa Dains and others to receive Western Union funds representing drug proceeds.

Wilkes' relative responsibility in the conspiracy was greater than that of several of his co-defendants I have sentenced. His share of the profits was proportionally greater as well. Thus, I find Wilkes deserves a four-level upward adjustment for his role in the drug and money laundering conspiracies. U.S.S.G. § 3B1.1(a).

### B. Departure Based on Overstatement of Criminal History

■ I reject Probation's recommendation that Wilkes appropriately falls within Criminal History Category III. In light of all the circumstances of this case, Category III significantly over-represents the seriousness of Wilkes' criminal record and the likelihood that Wilkes will recidivate.

Wilkes' criminal history score derives from two convictions for minor drug offenses. In 1990, at age nineteen, Wilkes was arrested at a rock concert for possession of marijuana and dangerous drugs (psilocybin). He was convicted of the marijuana charge and received three years probation, which was not discharged until April 20, 1995. He receives two additional points for the rock concert charge because his participation in the instant offense began while he was still under supervision for his 1991 conviction. Wilkes was also convicted of possession of under fifty grams of marijuana in Neptune Township Municipal Court after being arrested for possessing a marijuana cigarette. Clearly, both of these offenses arose from the same self-destructive behavior that led to this prosecution. Wilkes' minor criminal record paints a picture of the typical Category I offender, not a Category III offender.

Recognizing the inadequacies of the criminal history scoring system, the U.S. Sentencing Commission ("the Commission") encourages [25] departures where "reliable information" indicates that the criminal history category significantly over-represents or under-represents the "seriousness of a defendant's criminal history or the likelihood that the defendant will commit further crimes." U.S.S.G. § 4A1.3 (policy statement); *Lindia*, 82 F.3d at 1165; *see also* U.S.S.G. ch. 5, pt. H, introductory cmt. and § 5H1.8 (stating that criminal history is relevant in determining if the sentence should be outside the applicable guideline range).

To qualify for this departure, unlike departures in Chapter 5, the court does not have to find "there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission" in

---

**25.** Clearly, section 4A1.3 departures are "encouraged departures" under *Koon v. United* *States*, 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996).

promulgating the Guidelines. 18 U.S.C. § 3553(b); U.S.S.G. § 5K2.0. The statutory authority for the promulgation of U.S.S.G. section 4A1.3 lies not in 18 U.S.C. § 3553(b), but in 28 U.S.C. § 994(d)(10), the provision of the Sentencing Reform Act that gives the Commission the authority to take into account, where relevant, the defendant's criminal background. *United States v. Shoupe*, 988 F.2d 440, 446 (3rd Cir.1993). "The criminal history category departure under § 4A1.3 is specifically provided for in the Guidelines and is . . . conceptually distinct from the provision in § 5K2.0 for departures based on factors not accounted for in the Guidelines." *Id.* at 442; *cf. United States v. Cadavid*, 192 F.3d 230, 238 (1st Cir.1999) (upholding departure using section 4A1.3 analysis, not section 5K2.0 analysis).

Pursuant to my discretion under Guidelines sections 4A1.3 and 5H1.8, I will depart down horizontally from Category III to Category I.

### C. *Downward Departure Based on Extraordinary Post-arrest Rehabilitation*

■ Wilkes requests a downward departure on the basis of his post-arrest efforts to rehabilitate himself. A defendant's post-arrest efforts to rehabilitate himself do not ordinarily form the basis for a departure from the applicable Guideline range. *United States v. Sklar*, 920 F.2d 107, 116 (1st Cir.1990). Before a district court departs on this ground, the court must find that the defendant's rehabilitation is "of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission" in formulating the Guidelines. 18 U.S.C. § 3553(b); U.S.S.G. 5K2.0; *Sklar* 920 F.2d at 115–16. This is especially true because the Commission has factored "presentence" rehabilitation into the offense level adjustment

for acceptance of responsibility. *See* U.S.S.G. § 3E1.1; *Sklar*, 920 F.2d at 115–16. Thus, the First Circuit expressly described the type of case in which such a departure is warranted:

> We continue to believe that, in an appropriate case, a defendant's presentence rehabilitative efforts and progress can be so significant, and can so far exceed ordinary expectations, that they dwarf the scope of presentence rehabilitation contemplated by the sentencing commissioners when formulating section 3E1.1. We hold, therefore, that a defendant's rehabilitation might, on rare occasion, serve as a basis for a downward departure, but only when and if the rehabilitation is "so extraordinary as to suggest its presence to a degree not adequately taken into consideration by the acceptance of responsibility reduction."

*Sklar* 920 F.2d at 116 (quoting *United States v. Studley*, 907 F.2d 254, 259 (1st Cir.1990)).

■ Wilkes presents one of these "rare" cases. Contrary to the government's position, Wilkes' rehabilitative efforts far exceed those necessary for the basic "acceptance of responsibility" adjustment. I do not believe a defendant could accomplish more between arrest and sentencing.[26]

After a decade of severe alcohol and drug abuse, Wilkes has far surpassed his counselors' expectations for his recovery. He attends weekly AA and NA meetings to maintain his health. He has remained drug-free. Wilkes re-established meaningful personal and family relationships, providing necessary assistance to his grandmother on a daily basis. He has maintained steady employment, holding two or three jobs at a time, for the very first time in his life. And he attained all of these accomplishments while finding the time to acquire his G.E.D. and enroll as

---

**26.** Wilkes' efforts certainly compare favorably with defendants found deserving of an extraordinary rehabilitation departure in other courts. *E.g., United States v. Maier*, 975 F.2d 944, 945–46 (2d Cir.1992); *United States v. Harrington*, 808 F.Supp. 883, 885–86 (D.D.C. 1992).

full-time college student. Before sentencing, Wilkes was well on his way back to a healthy and productive life, with the goal of eventually serving the needs of other chemically-dependent individuals.

Wilkes post-arrest efforts to rehabilitate himself easily take this case out of the "ordinary" category. Wilkes is entitled to a downward departure.

## V. CALCULATION OF WILKES' SENTENCE

### A. Count One

The base offense level on Count One is level twenty-six. U.S.S.G. § 2D1.1(c)(7). I have adjusted the base offense level upward four levels to account for Wilkes' role in the drug trafficking conspiracy. U.S.S.G. § 3B1.1(a). His adjusted offense level on Count One is thirty.

### B. Count Two

The base offense level on Count Two is level twenty. U.S.S.G. § 2S1.1(a)(2). I have adjusted the base offense level upward by three levels to account for the specific offense characteristics of the money laundering crime, namely, Wilkes knew that the funds being laundered were the proceeds of an unlawful activity involving the distribution of a controlled substance. U.S.S.G. § 2S1.1(b)(1). Also, I have increased the offense level on Count Two by four levels to account for Wilkes' aggravated role in the offense, namely, his organizer status. U.S.S.G. § 3B1.1(a). His adjusted offense level on Count Two is level twenty-seven.

### C. Multiple Count Adjustment

Pursuant to U.S.S.G. section 3D1.4, the multiple count adjustment provision, Wilkes receives one unit each for Counts One and Two. The total number of additional units is two. The two additional units are added to the higher of the two adjusted offense levels (i.e., level thirty on Count One), yielding a combined adjusted offense level of thirty-two. U.S.S.G. § 3D1.4.

### D. Adjustment for Acceptance of Responsibility

Wilkes qualifies for a downward adjustment of three levels for his acceptance of responsibility because he entered a timely guilty plea and allowed the government to avoid preparation for trial. U.S.S.G. § 3E1.1(b).

### E. Total Offense Level

After all adjustments, up and down, Wilkes' total adjusted offense level is twenty-nine.

### F. Criminal History Score

Pursuant to U.S.S.G. section 4A1.1(c), Wilkes' two prior convictions yield two criminal history points. The instant conspiracies occurred at a time when Wilkes was still on probation for a minor drug offense. Thus, his criminal history score is adjusted upward by two points. U.S.S.G. § 4A1.1(d). His resulting criminal history score is four, placing him in Criminal History Category III.

### G. Guideline Sentencing Range

Under the Sentencing Table in chapter five, Wilkes' Guideline sentencing range comes to 108 to 135 months' incarceration. U.S.S.G. ch. 5, pt. A.

### H. Departures

#### 1. Criminal History

I am granting Wilkes a downward departure from Criminal History Category III to Category I. The new Guidelines sentencing range is 87 to 108 months' incarceration. U.S.S.G. § 4A1.3.

#### 2. Extraordinary Post-arrest Rehabilitation

I am granting Wilkes a downward departure to the mandatory minimum penalty of sixty months' incarceration on the

basis of his extraordinary post-arrest rehabilitation. U.S.S.G. § 5K2.0.

## VI. *CONCLUSION*

For the reasons stated above, Wilkes' motion for reduced sentence via *Apprendi* is **DENIED.** Wilkes' motion for a downward departure is **GRANTED.** I sentence Wilkes to the minimum period of incarceration allowed by Congress—sixty months. The time Wilkes spent in pretrial custody and inpatient drug treatment in 1997 and 1998 shall be credited against his sentence as well.

**SO ORDERED.**